USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: _08/20/2014_

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X
                                                                        :
BROADSPRING, INC.,                                                      :
                                                                        :
                              Plaintiff,          :          13-CV-1866 (JMF)
                                                                        :
            -v-                                    :          OPINION AND ORDER
                                                                        :
CONGOO, LLC, *d/b/a Adiant*, et al.,             :
                                                                        :
                              Defendants.         :
                                                                        :
------------------------------------------------------------------------X

JESSE M. FURMAN, United States District Judge:

     This is a lawsuit between bitter rivals in the online advertising industry. Plaintiff

Broadspring, Inc. ("Broadspring") brought the action against its competitor, Congoo, LLC

("Congoo"), and two Congoo executives, Chief Executive Officer, Ashraf Nashed, and Senior

Vice President of Business Development, Rafael Cosentino (collectively, "Defendants").

Broadspring alleges principally that Defendants engaged in a campaign to spread false and

defamatory information about it through Internet posts and other communications. Congoo, in

turn, has brought counterclaims alleging that Broadspring made false and misleading statements

about Congoo to two of its clients. (Am. Compl. (Docket No. 27); Answer & Am. Countercls.

(Docket No. 45)). Before the Court are seven different motions, including cross-motions for

summary judgment, dueling motions to exclude the testimony of expert witnesses at trial, two

motions by Plaintiff for discovery-related sanctions, and a motion by Plaintiff for leave to file a

Second Amended Complaint. (Docket Nos. 75, 94, 97, 98, 102, 108).

     For the reasons stated below, Defendants' motion for summary judgment is denied except

with respect to the tortious interference claim against Defendant Nashed. In addition, Plaintiff's

motion for summary judgment is granted. Further, Plaintiff's motion to exclude is granted in

part and denied in part, and Defendants' motion to exclude is denied.  Finally, Plaintiff's motion

for sanctions based on improper designations of material as highly confidential is granted,

Plaintiff's motion for sanctions based on spoliation of evidence is granted in part and denied in

part, and Plaintiff's motion seeking leave to file a Second Amended Complaint is granted.  The

end result is that, but for the tortious interference claim against Defendant Nashed, all of

Plaintiff's affirmative claims remain, and all of Congoo's counterclaims are dismissed.

## BACKGROUND

### A.  The Parties

As noted, Broadspring and Congoo are competitors in the online advertising business.

(Markiles Decl. (Docket No. 141) ¶ 3; Nashed Decl. (Docket No. 104) ¶ 10).  They each operate

online advertising networks, which connect advertisers with websites, or "publishers."  (Markiles

Decl. ¶ 3).  Online advertising networks place their advertisers' advertisements on publishers'

websites, generating revenue from the advertisers and, in turn, paying publishers for the space.

(*Id.*).  The online advertising networks pay publishers either on a "CPM" basis — that is, a fixed

sum per every thousand impressions (or viewers) that an advertisement receives — or on a

"revenue share" basis, whereby the publisher receives a percentage of the revenue the advertising

network derives from its advertisers.  (*Id.*).

Broadspring is a Delaware corporation whose sole office is in Irvine, California.  (*Id.*

¶ 1).  It was incorporated in 2002, but had no revenue prior to June 2004, at which point it

acquired the assets of another company, Mindset Interactive, Inc.  (Alexander Decl. Supp. Defs.'

Mot. Summ. J. (Docket No. 111), Ex. 4 ("Markiles Dep.") 38:16-40:2; Alexander Decl. Supp.

Defs.' Mot. Summ. J., Ex. 8 ("Jatwani Dep.") 27:5-11; Alexander Decl. Supp. Defs.' Mot.

Summ. J., Ex. 21).  Congoo, which launched its online advertising business in 2008 and also

operates under the names Adiant and Adblade, is a Delaware limited liability company whose

principal place of business is in Somerville, New Jersey.  (Nashed Decl. ¶¶ 2-3).  As noted,

Nashed is Congoo's Chief Executive Officer and Cosentino is its Senior Vice President of

Business Development.  (*Id.* ¶¶ 1, 9).

## B.  The Squidoo Lens and Its Dissemination

The dispute between the parties centers on a web page that Defendant Cosentino created

in mid-February 2013 on the website www.squidoo.com, which is a platform that allows users to

create pages, or "lenses," on subjects of their choice.  (Cosentino Decl. (Docket No. 105) ¶ 2;

Godin Decl. (Docket No. 106) ¶ 2).  Under the moniker "Recruiterman" — whose profile page

states that the account holder "live[s] in Brooklyn with [his] wife Susan and [their] 4 year[] old

boy Liam," none of which applies to Cosentino — Cosentino created a page (the "Lens") on the

topic of online advertising and marketing businesses.  (Cosentino Decl. ¶ 2; Katz Decl. Opp'n

Defs.' Mot. Summ. J. (Docket No. 143), Ex. 3; Alexander Decl. Supp. Defs.' Mot. Summ. J., Ex.

3 ("Cosentino Dep.") 252:24-253:22).[1]  The Lens provided Cosentino's commentary — without

disclosing his identity or his relationship to Congoo — on thirteen different advertising

networks, including Broadspring and Congoo.  (Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 4).

In its first iteration, the Lens stated that "many of [Broadspring's] advertisers appear to be

continuity programs (re-bill offers) where the advertiser gets the customer to enter their credit

card for a free trial and the[n] makes it tough to cancel.  I'd be careful here."  (*Id.* at 3).

---

[1]    Plaintiff represents that the Recruiterman profile page indicates that the account holder's name is Jonathan Tovar, but the screenshot of the page submitted to the Court does not show the account holder's name.  (*See* Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 3).   In his deposition, Cosentino did not appear to contest that the Lens was posted under the name Jonathan Tovar, and admitted that he knows no one with that name.  (Cosentino Dep. 198:14-199:16, 254:3-16).

On February 23, 2013, Cosentino e-mailed Nashed a link to the Lens, to which Nashed replied: "Ingenious!"  (Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 5).  On March 2, 2013, Nashed sent Cosentino another e-mail, which contained additional statements about Broadspring. (Cosentino Decl. ¶ 13).  Among other things, Nashed wrote that "it looks like Broadspring was formerly Mindset Interactive, a notorious spyware company.  Mindset was eventually shut down by the [Federal Trade Commission ("FTC")] and Sanford Wallace, their founder, known as 'Spamford Wallace' was banned from online activity for 5 years."  (Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 6).  Toward the end of the e-mail, Nashed wrote "[o]ur publishers should know about [Broadspring's] background."  (*Id.*).  Cosentino reviewed the e-mail, performed some "Google searches of [his] own," and then revised the Lens that same day.  (Cosentino Decl., ¶ 14-15).  The updated version of the Lens contained text that was nearly identical to the text of Nashed's e-mail.  Under the "Broadspring" header, the revised Lens read:

> A simple Google search shows that Broadspring was formerly Mindset Interactive, a notorious spyware company.  Mindset was eventually shut down by the FTC in 2005 and Sanford Wallace, their founder, known as "Spamford Wallace" was banned from online activity for 5 years.  In Nov 2006, Broadspring's shareholders then launched the notorious ringtones company, New Motion, dba Atrinsic.  Atrinsic had $17mm in financing (from various unknown investors), became public through a shady reverse-merger.  They settled 3 years ago with 6 million users scammed: http://www.ftc.gov/os/caselist/0423142/ WallaceFinalJudgment.pdf

(Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 7).  On March 4, 2013, Cosentino sent Nashed a link to the Lens using his Yahoo! Instant Messenger account.  (*Id.*, Ex. 8; Cosentino Decl. ¶ 24).

Cosentino disseminated the Lens, as well as statements similar to those made in the Lens, in several ways.  First, he posted links to the Lens in discussion threads on other websites under false names.  (*See, e.g.*, Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 9, at 2; *Id.*, Ex. 10, at 5; Cosentino Dep. 289:6-20, 293:6-294-22).  Second, he e-mailed links to the Lens directly to publishers, including Intermarkets.net, the New Hampshire Union Leader, the New York Daily

News, and Geology.com.  (Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 11, at 8; *Id.*, Ex. 12, at 5; *Id.*, Ex. 13, at 2; *Id.*, Ex. 14, at 2; Cosentino Decl. ¶ 26).  Third, although Squidoo "locked" the Lens on March 11, 2013 (making it inaccessible to the public) (Godin Decl. ¶ 7; Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 15), Cosentino pseudonymously re-posted many of the statements that were on the Lens in a discussion thread on another website, Contextly.com.  Under the name "Richard J," for example, Cosentino posted the following:

> [Broadspring] used to distribute spyware under the company name Mindset Interactive. When they were named in a lawsuit by the FTC they dropped that name.  They then formed a new company called Atrinsic dba New Motion which distributed Ring tone scams to 13 year olds.  They were again sued and this time had to settle a class action lawsuit with 6 Million people.  Now Broadspring is using content.ad to drive consumer[] to howlifeworks and those fake editorials which are not even marked as such so they can get their credit cards and re-bill them.  Publishers who work with these guys simply have zero critical thinking or care[] about their audience.

(Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 16, at 10-11; Cosentino Dep. 300:12-19).  Even after posting on Contextly.com, Cosentino continued to e-mail similar statements to publishers directly.  (*See, e.g.*, Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 18, at 149 ("So you know, the folks at Broadspring shut down their company (mindset interactive) soon after they were named by the FTC in a lawsuit for distributing spyware.")).

**C.  Geology.com**

One publisher that is particularly relevant to the parties' claims is Geology.com.  In June 2012, Congoo and Geology.com had entered into an agreement that provided Congoo with the exclusive right to serve advertisements "with a thumbnail image and/or a title and/or a description and/or a call to action" on Geology.com.  (Alexander Decl. Supp. Defs.' Mot. Summ. J., Ex. 40).  The agreement provided that it could be terminated with ninety days of notice.  (*Id.*).  In February 2013, without either party terminating the agreement, Geology.com began to run Broadspring advertisements as well as the Congoo advertisements.  (Pl.'s Response to Defs.'

Rule 56.1 Statement (Docket No. 144) ("Pl.'s Rule 56.1 Statement Response") ¶ 75; Alexander

Decl. Supp. Defs.' Mot. Summ. J., Ex. 41, at 5).  Apparently, Cosentino saw the Broadspring

advertisements; he then called Hobart King, the principal of Geology.com, on March 5, 2013,

and stated that King "could get in trouble running those ads."  (Katz Decl. Opp'n Defs.' Mot.

Summ. J., Ex. 19 ("King Dep.") 74:9-17).  Cosentino also told King that Broadspring had

"gotten in trouble for spyware" and that it had been "in court over something."  (*Id.* at 74:19-

75:3).  Later that day, Cosentino e-mailed King a link to the Lens, which he told King he could

read to "get a review on Broadspring ads and other ad networks."  (*Id.* at 77:23-78:2; Katz Decl.

Opp'n Defs.' Mot. Summ. J., Ex. 14, at 2).[2]

 Within the next few days, Geology.com terminated its dealings with Broadspring.  In

fact, the very day that that Cosentino called King and sent him the Lens, King's webmaster was

in the midst of replacing Congoo's advertisements with Broadspring advertisements.  (King Dep.

80:18-23).  After King received Cosentino's e-mail, however, he "changed his mind," and told

his webmaster to put the Congoo advertisements back up.  (*Id.* at 81:4-11; Pl.'s Rule 56.1

Statement Response ¶ 77).  Although the precise reasons for King's decision are in dispute, King

testified that he changed his mind "mainly" because he was "concerned about what he had read

[in the Lens], and [because he] was concerned about spyware."  (King Dep. 81:13-15; *see also*

Alexander Decl. Supp. Defs.' Mot. Summ. J., Ex. 41, at 14 (King responding to an e-mail from

Brett Houck, a business development manager at Broadspring, who asked what Broadspring

could do to get its advertisements put back up on Geology.com, by saying "[s]omeone sen[t] me

a link to [the Lens]," and that he was therefore "hesitant to run the ads after seeing the above").

---

[2] Cosentino did not tell King who wrote the Lens.  In fact, King appears to have been
unaware that Cosentino authored the Lens until he was informed of that fact at his deposition.
(King Dep., 80:3-11).

**D.  Procedural History**

Plaintiff filed its initial Complaint on March 20, 2013 (Docket No. 1), and then filed the

Amended Complaint on April 24, 2013 (Docket No. 27).  The Amended Complaint asserts a

Lanham Act claim, a defamation claim, and a tortious interference claim.  (*Id.*, at 7-8).

Defendants filed their Answer on April 11, 2013, which asserted Lanham Act, defamation, and

tortious interference counterclaims, all based on allegations that Broadspring "systematically

solicited publishers, including Readers Digest, Geology.com, Tech Media, World Now, and The

Journal Register Company (the 'Congoo Clients'), from whom Congoo purchases space."

(Answer & Countercls. (Docket No. 26) ¶¶ 48, 56, 63).  On July 26, 2013, Defendants amended

their Answer and Counterclaims, limiting the "Congoo Clients" to Reader's Digest and

Geology.com, and only asserting causes of action for tortious interference and unfair

competition.  (Am. Answer & Countercls. (Docket No. 45) ¶¶ 45-56).

As noted, there are seven motions presently before the Court.  They include:

(1) Defendants' motion for summary judgment, which seeks dismissal of the claims against them

and judgment in their favor on the unfair competition counterclaim (Docket No. 97);

(2) Plaintiff's motion for summary judgment or, alternatively, judgment on the pleadings,

seeking to dismiss Defendants' counterclaims (Docket No. 108); (3) Plaintiff's motion to

preclude Defendants' expert, Lance James, from testifying at trial (Docket No. 102);

(4) Defendants' motion to preclude Plaintiff's expert, Marty Lafferty, from testifying at trial

(Docket No. 94); (5) Plaintiff's motion, filed *in camera*, for sanctions based on the improper

designation of documents as "Highly Confidential — Attorneys' Eyes Only" ("AEO");

(6) Plaintiff's motion for sanctions based on the spoliation of evidence, namely the failure to

preserve instant messages (Docket No. 98); and (7) Plaintiff's motion seeking leave to file a

Second Amended Complaint (Docket No. 75). For the reasons that follow, Defendants' motion

for summary judgment is denied, except with respect to the tortious interference claim against

Defendant Nashed, and Plaintiff's motion for summary judgment is granted. Further, Plaintiff's

motion to exclude is granted in part and denied in part and Defendants' motion to exclude is

denied. Finally, Plaintiff's motion for sanctions based on improper designations is granted,

Plaintiff's motion for sanctions based on spoliation of evidence is granted in part and denied in

part, and Plaintiff's motion seeking leave to file a Second Amended Complaint is granted.

## SUMMARY JUDGMENT MOTIONS

The Court first addresses the motions for summary judgment. Summary judgment is

appropriate where the admissible evidence and the pleadings demonstrate "no genuine dispute as

to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A dispute over an issue of material fact qualifies as genuine if the "evidence is such that a

reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby*,

*Inc.*, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, all evidence must

be viewed "in the light most favorable to the non-moving party," *Overton v. N.Y. State Div. of*

*Military & Naval Affairs*, 373 F.3d 83, 89 (2d Cir. 2004), and a court must "resolve all

ambiguities and draw all permissible factual inferences in favor of the party against whom

summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391

F.3d 77, 83 (2d Cir. 2004). When, as here, both sides move for summary judgment, a court is

"required to assess each motion on its own merits and to view the evidence in the light most

favorable to the party opposing the motion, drawing all reasonable inferences in favor of that

party." *Wachovia Bank, Nat'l Ass'n v. VCG Special Opportunities Master Fund, Ltd.*, 661 F.3d

164, 171 (2d Cir. 2011). Thus, "neither side is barred from asserting that there are issues of fact,

sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993).

"In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995); *accord PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 105 (2d Cir. 2002). By contrast, to defeat a motion for summary judgment, the non-moving party must advance more than a "scintilla of evidence," *Anderson*, 477 U.S. at 252, and demonstrate more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). The non-moving party "cannot defeat the motion by relying on the allegations in [its] pleading or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible." *Gottlieb v. Cnty. of Orange*, 84 F.3d 511, 518 (2d Cir. 1996) (citation omitted). Affidavits submitted in support or in opposition to summary judgment must be based on personal knowledge, must "set forth such facts as would be admissible in evidence," and must show "that the affiant is competent to testify to the matters stated therein." *Patterson v. Cnty. of Oneida*, 375 F.3d 206, 219 (2d Cir. 2004).

## A. Plaintiff's Claims

The Court begins with Defendants' summary judgment motion to the extent that it seeks dismissal of Plaintiff's claims. Defendants move to dismiss Plaintiff's defamation claim, its Lanham Act claim, and its tortious interference claim. The Court addresses each in turn.

### 1.    Plaintiff's Defamation Claim

### a.  Choice of Law

The Court begins with Plaintiff's defamation claim.  Before considering Defendants'
arguments, the Court must first determine the source of law that applies.  As this Court sits in
New York, it must apply the New York choice-of-law analysis, *see Klaxon Co. v. Stenton Elec.
Mfg. Co.*, 313 U.S. 487, 496 (1941), which first asks whether there is an "actual conflict of
laws," *Condit v. Dunne*, 317 F. Supp. 2d 344, 352 (S.D.N.Y. 2004).  The two potential sources of
defamation law — California and New York (*compare* Pl.'s Mem. Opp'n Defs.' Mot. Summ. J.
(Docket No. 140) 8-10 *with* Defs.' Reply Mem. Supp. Defs.' Mot. Summ. J. (Docket No. 158) 2-
4) — do indeed conflict, as New York law grants opinions greater protection from defamation
actions than California law does.  *Condit*, 317 F. Supp. 2d at 352.  Accordingly, the Court must
decide which state's law applies.

In tort actions such as this one, New York applies the law of the state with the "most
significant interest in the litigation."  *Lee v. Bankers Trust Co.*, 166 F.3d 540, 545 (2d Cir. 1999).
In weighing those interests, New York courts distinguish between conflicts regarding "conduct-
regulating" rules and conflicts regarding "loss-allocating" rules.  *Id.*  Defamation law regulates
conduct, so the rule is to apply "the law of the place of the tort ('*lex loci delicti*')."  *Id.*; *see also
Condit*, 317 F. Supp. 2d at 353.  In this case, however, it is not obvious where the tort occurred,
as the Lens was posted on the Internet and was thus accessible nationwide.  As one court has
observed, "in cases where a defamatory statement is published nationally," as here, "it is not
immediately apparent how one might identify 'the place' where the tort of defamation occurred."
*Adelson v. Harris*, 973 F. Supp. 2d 467, 477 (S.D.N.Y. 2013); *see also Condit*, 317 F. Supp. 2d
at 353 ("In a defamation case where the statements at issue are published nationwide . . . the

locus of the tort factor begs, rather than answers, the ultimate choice of law question.").  In such

cases, there is a presumptive rule that the law of the plaintiff's domicile applies.  *See, e.g.*,

*Adelson*, 973 F. Supp. 2d at 477; *see also Reeves v. Am. Broad. Co., Inc.*, 719 F.2d 602, 605 (2d

Cir. 1983) (noting that "the state of the plaintiff's domicile will usually have the most significant

relationship to the case"); *Davis v. Costa-Gavras*, 580 F. Supp. 1082, 1091 (S.D.N.Y. 1984) ("In

a libel case, the state of most significant relationship is usually the state where the plaintiff was

domiciled at the time, if the libel was published in that state, since that is where he is presumed

to have been most injured.").  Here, that would mean the law of California — where Broadspring

is domiciled.  (Markiles Decl. ¶ 1).  *See also, e.g.*, *Dargahi v. Hymas*, No. 05-CV-8500 (BSJ),

2008 WL 8586675, at *5 (S.D.N.Y. Oct. 15, 2008) ("Under New York law, the domicile of a

corporation for choice-of-law purposes is the State where it maintains its principal place of

business." (internal quotation marks omitted)).

To be sure, the presumptive rule in favor of the law of the plaintiff's domicile "does not

hold true if . . . some other state has a more significant relationship to the issue or the parties."

*Adelson*, 973 F. Supp. 2d at 477 (internal quotation marks omitted).  But in this case, there is no

basis to conclude that New York (or any other state) has a more significant relationship to the

defamation claims than California.  (*See* Defs.' Reply Mem. Supp. Defs.' Mot. Summ. J. 2-4).

California has an obvious interest in protecting its citizens from defamatory statements.  *See*

*Adelson*, 973 F. Supp. 2d at 478 (noting that Nevada, the state where plaintiff's business was

based, "has an interest in protecting its citizens from tortious conduct"); *Condit*, 317 F. Supp. 2d

at 353 ("[T]he state of the plaintiff's domicile has an interest in protecting its citizens from

defamation.").  New York, on the other hand, has an interest in protecting the First Amendment

rights of its citizens, *see, e.g.*, *Adelson*, 973 F. Supp. 2d at 478, but no Defendant is a citizen or

resident of New York.  (Nashed Decl. ¶ 2 (indicating that Congoo is incorporated in Delaware and its principal place of business is in New Jersey); Cosentino Dep. 253:11-13 (indicating that Cosentino resides in New Jersey); Am. Compl. ¶ 4 (alleging that Nashed is a citizen of New Jersey)).  Neither the fact that Plaintiff filed suit in New York nor the fact that Defendant Cosentino did "much of the drafting . . . of the Squidoo Lens . . . while [he] was in New York" (Cosentino Reply Decl. (Docket No. 160) ¶ 2) is sufficient, by itself, to displace the presumption that California law should apply.  *See Adelson*, 973 F. Supp. 2d at 472, 477-79 (applying the law of Plaintiff's domicile, Nevada, over the law of the District of Columbia, even though the allegedly defamatory statements were published by an organization whose principal place of business was in the District of Columbia); *cf. Hatfill v. Foster*, 401 F. Supp. 2d 320, 324-25 (S.D.N.Y. 2005) (after surveying libel cases between out-of-state plaintiffs and New York defendants, finding a "marginal preference" for the law of the plaintiff's domicile, and noting that "where defendant's domicile trumped plaintiff's, New York had some other significant connection to the case"), *rev'd on reconsideration*, 415 F. Supp. 2d 353 (S.D.N.Y. 2006).  Accordingly, the Court will evaluate the defamation claim under California law.[3]

### b. Plaintiff's Claim Under California Law

Defendants advance two main arguments as to why Broadspring's defamation claim should be dismissed.  First, Defendants argue that they are immune from liability because the Lens is a constitutionally protected opinion under the First Amendment.  (Defs.' Mem. Supp. Defs.' Mot. Summ. J. (Docket No. 100) 5-10; Defs.' Reply Mem. Supp. Defs.' Mot. Summ. J. 4-

---

[3]      Although California law applies to the defamation claim, the parties do not dispute that the law of the Second Circuit applies to the Lanham Act claim or that New York law applies to the tortious interference claim.  *See In re Horizon Cruises Litig.*, 101 F. Supp. 2d 204, 207 n.1 (S.D.N.Y. 2000) ([C]hoice of law determinations are made on a claim-by-claim basis.").  The Court will thus analyze those claims accordingly.

7).  Second, they contend that they have successfully raised the "substantial truth" defense.

(Defs.' Mem. Supp. Defs.' Mot. Summ. J. 10-17; Defs.' Reply Mem. Supp. Defs.' Mot. Summ.

J. 8-11).  The Court finds both arguments for summary judgment without merit.

 As a general rule, "[a]lthough statements of fact may be actionable as libel, statements of

opinion are constitutionally protected."  *McGarry v. Univ. of San Diego*, 64 Cal. Rptr. 3d 467,

479 (Cal. Ct. App. 2007) (citing *Baker v. Los Angeles Herald Examiner*, 721 P.2d 87, 90 (Cal.

1986)).  Statements that are simply "couch[ed] . . . in terms of opinion," however, are not

protected, as they may still "imply a false assertion of fact."  *Milkovich v. Lorain Journal Co.*,

497 U.S. 1, 18-19 (1990).  To distinguish between constitutionally protected expressions of

opinion and actionable assertions of fact, California courts ask "whether a reasonable fact finder

could conclude the published statement declares or implies a provably false assertion of fact."

*McGarry*, 64 Cal. Rptr. 3d at 479; *see also Summit Bank v. Rogers*, 142 Cal. Rptr. 3d 40, 59-60

(Cal. Ct. App. 2012) (similar); *Nygard, Inc. v. Uusi-Kerttula*, 72 Cal. Rptr. 3d 210, 226 (Cal. Ct.

App. 2008) (similar).  In conducting that inquiry, courts consider the "totality of the

circumstances," including the language of the statement and the context in which the statement

was made.  *Franklin v. Dynamic Details, Inc.*, 10 Cal. Rptr. 3d 429, 436-37 (Cal. Ct. App. 2004).

 Here, there is no question that Defendants' statements about Broadspring imply provably

false factual assertions.  For example, the Lens affirmatively asserts that "Broadspring was

formerly Mindset Interactive," which was "shut down by the FTC in 2005."  (Katz Decl., Ex. 7).

Whether Broadspring or Mindset Interactive was "shut down by the FTC in 2005" is plainly a

provably false assertion of fact, and a preface that the assertion was revealed by "[a] simple

Google search" does not render it constitutionally protected opinion.  *See Weller v. Am. Broad.*

*Cos.*, 283 Cal. Rptr. 644, 652 (Cal. Ct. App. 1991) ("[W]e reject the notion that merely couching

an assertion of a defamatory fact in cautionary language such as 'apparently' or 'some sources say' . . . necessarily defuses the impression that the speaker is communicating an actual fact."). To cite another example, the Lens states that "Sanford Wallace, their founder, known as 'Spamford Wallace' was banned from online activity for 5 years."  (Katz Decl., Ex. 7).  Among other things, that statement clearly implies the provably false assertion that Sanford Wallace was the founder of either Broadspring or Mindset Interactive.  In addition, Cosentino repeated the assertion regarding Broadspring being sued or shut down by the FTC in the Contextly.com posting (Katz Decl. Opp'n Defs.' Mot. Summ. J., Ex. 16, at 10-11; Cosentino Dep. 300:12-19), and in an e-mail to publisher KSL/Deseret News (Katz Decl., Ex. 32).

Further, Defendants' contention that the Lens, "taken as a whole," is a non-actionable opinion is baseless.  (Defs.' Mem. Supp. Defs.' Mot. Summ. J. 5-8).  Putting aside the fact that the Lens is just one of numerous places where Defendants made assertions about Broadspring, the Lens is not at all akin to the rankings that the Eastern District of Tennessee deemed non-actionable in *Seaton v. TripAdvisor, LLC*, No. 11-CV-549, 2012 WL 3637394, at *7 (E.D. Tenn. Aug. 22, 2012), *aff'd*, 728 F.3d 592 (6th Cir. 2013).  In *Seaton*, the allegedly defamatory statement was TripAdvisor.com's "2011 Dirtiest Hotels" list, a rank ordering of the purportedly ten dirtiest hotels in the United States according to the site's users.  *Id.* at *2.  Although the Lens does provide rankings for each of the thirteen advertising networks it discusses (*see* Katz Decl., Ex. 7), it contains specific, detailed, and provably false factual assertions about the networks as well, including, as relevant here, Broadspring.

Defendants' second argument — namely, that the statements in the Lens are substantially true — fares no better.  In general, "[t]he burden of pleading and proving truth is on the defendant."  *Smith v. Maldonado*, 85 Cal. Rptr. 2d 397, 403 n.5 (Cal. Ct. App. 1999).  Congoo

argues that the burden has shifted here because Broadspring is a "limited purpose public entity." (Defs.' Reply Mem. Supp. Defs.' Mot. Summ. J. 8 n.10).  But that argument is without merit. The essence of the limited public purpose doctrine is that if there is a "public controversy," and the plaintiff has "undertaken some voluntary act through which he or she sought to influence resolution of the public issue," the burden shifts to the plaintiff to prove that the allegedly defamatory statement was made with knowledge of falsity or reckless disregard for truth.  *Ampex Corp. v. Cargle*, 27 Cal. Rptr. 3d 863, 869-70 (Cal. Ct. App. 2005).  But here, the public controversy into which Broadspring is alleged to have inserted itself is the very controversy that Congoo created — namely, the truth of the allegations made in the Lens.  (*See* Defs.' Reply Mem. Supp. Defs.' Mot. Summ. J. 8 n.10 (citing Alexander Reply Decl., Ex. 4)).  A defendant cannot "create a public controversy simply by publishing an article that put plaintiff's behavior in the spotlight."  *Carver v. Bonds*, 37 Cal. Rptr. 3d 480, 501 (Cal. Ct. App. 2005); *see also Hutchinson v. Proxmire*, 443 U.S. 111, 135 (1979) ("[T]hose charged with defamation cannot, by their own conduct, create their own defense by making the claimant a public figure.").  Accordingly, there is no "public controversy" for purposes of the limited public purpose doctrine, and it is Defendants' burden to establish the truth of their statements.

Defendants have come nowhere close to doing so.  To the contrary, the evidence submitted indicates that many of the statements were indeed false.  For example, neither Broadspring nor Mindset was ever sued or "shut down" by the FTC.  (Markiles Decl. ¶ 12). Instead, the FTC investigated Sanford Wallace for his marketing and software distribution practices, and Wallace was a third-party software distributor of Mindset's.  (Jatwani Dep. 70:11-18, 84:23-85:11).  Ultimately, the investigation resulted in a default judgment being entered against Wallace and his corporation SmartBot.Net (Alexander Decl. Supp. Defs.' Mot. Summ. J.,

Ex. 18), but neither Broadspring nor Mindset was named as a defendant in the case.  Further, Broadspring's decision to exit the business of software distribution was entirely voluntary, and motivated by concerns that the behavior of third-party distributors such as Wallace would be "difficult to police . . . adequately."  (Markiles Dep. 83:2-11).  Even further from the truth is the Lens's assertion that Wallace was "their founder" — "their" referring to Broadspring, Mindset, or both.  (Katz Decl., Ex. 7).  Defendants do not even attempt to argue that that statement is true, but meekly suggest that Wallace and Broadspring were "connected" as "business partners." (Defs.' Mem. Supp. Defs.' Mot. Summ. J. 14).  The difference between being the founder of a company and being "connected" as a business partner of a company, however, is far greater than the "slight inaccuracy in the details" that is permitted for the substantial truth defense under California law.  *See Gilbert v. Sykes*, 53 Cal. Rptr. 3d 752, 765 (Cal. Ct. App. 2007) (noting that inaccuracies are permitted only if they "do[] not change the complexion of the affair so as to affect the reader of the [publication] differently" (internal quotation marks omitted)).

Finally, the Court rejects Defendants' contention that the defamation claim fails against Nashed and Congoo because they "did not author or publish the Lens."  (Defs.' Mem. Supp. Defs.' Mot. Summ. J. 7 n.2).  To support a claim for defamation against Nashed, Plaintiff needs to establish only that Nashed "took a 'responsible part' in the publication of the defamatory matter," which includes "participating in the publication of an article."  *Hawran v. Hixson*, 147 Cal. Rptr. 3d 88, 105 (Cal. Ct. App. 2012).  Here, a reasonable jury could conclude that Nashed took a "responsible part" in the Lens's publication based on the e-mail exchange between Cosentino and Nashed, the updated version of the Lens posted on March 2, 2013, and Cosentino's admission that he "updated [the] Lens . . . with some of the information" in the e-mail from Nashed.  (Katz Decl., Ex. 5; *Id.*, Ex. 6; *Id.*, Ex. 7; Cosentino Dep. 219:11-220:4).  In

addition, given the nature of the statements, Cosentino's and Nashed's senior roles at Congoo,

and the fact that the two communicated about the Lens using their company e-mail addresses, a

reasonable jury could hold Congoo liable for the allegedly defamatory statements on a

*respondeat superior* theory. *See Rivera v. Nat'l R.R. Passenger Corp.*, 331 F.3d 1074, 1080 (9th

Cir. 2003) (noting, that under California law, an employer may be held liable for an employee's

defamatory statement "[a]s long as the statement was made within the scope of employment");

*see also Kelly v. Gen. Tel. Co.*, 186 Cal. Rptr. 184, 186 (Cal. Ct. App. 1982) (similar).

### 2.    Plaintiff's Lanham Act Claim

The Court next turns to Plaintiff's Lanham Act claim.  Section 43(a) of the Lanham Act

provides that

> [a]ny person who . . . in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another person's goods,
> services, or commercial activities, shall be liable in a civil action by any person who
> believes that he or she is likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B).  For a representation to qualify as "commercial advertising or

promotion," it must be: "(1) commercial speech, (2) made for the purpose of influencing

consumers to buy defendant's goods or services, and (3) although representations less formal

than those made as part of a classic advertising campaign may suffice, they must be disseminated

sufficiently to the relevant purchasing public."  *Gmurzynska v. Hutton*, 355 F.3d 206, 210 (2d

Cir. 2004) (internal quotation marks omitted) (citing *Fashion Boutique of Short Hills, Inc. v.

Fendi USA, Inc.*, 314 F.3d 48, 56, 57-58 (2d Cir. 2002)).  Here, Defendants contend that Plaintiff

has not established sufficient dissemination of the allegedly misleading representations.  (Defs.'

Mem. Supp. Defs.' Mot. Summ. J. 18-21).  The Court is not persuaded.

"[T]he touchstone of whether a defendant's act may be considered 'commercial

advertising or promotion' . . . is that the contested representations are part of an organized

campaign to penetrate the relevant market." *Fashion Boutique*, 314 F. 3d at 57.  Although "isolated disparaging statements" do not suffice, *id.; see also, e.g.*, *Prof'l Sound Servs., Inc. v. Guzzi*, 349 F. Supp. 2d 722, 729 (S.D.N.Y. 2004) ("Dissemination of a statement to one customer out of 36 simply does not meet this standard."), the "breadth of dissemination, although important, is not dispositive," and "the primary focus is the degree to which the representations in question explicitly target relevant consumers," *Gordon & Breach Science Publishers S.A. v. Am. Inst. of Physics*, 905 F. Supp. 169, 182 (S.D.N.Y. 1995).  Here, Cosentino admits that he e-mailed links to the Lens itself to four publishers (Cosentino Decl. ¶ 26), and, after Squidoo locked the Lens, he continued to send those and other publishers both links to the Contextly.com article and e-mails with statements about Broadspring similar to those in the Lens (Katz Decl., Ex. 18).  Based on those communications, as well as Nashed's e-mailed statement to Cosentino that "[o]ur publishers should know about [Broadspring's] background," a reasonable jury could conclude that Defendants' dissemination of the Lens, the Contextly.com article, and other e-mails were part of an organized campaign to penetrate the market of publishers.  (*Id.*, Ex. 6).

The Court also rejects Defendants' argument that the false advertising claim should be dismissed for failure to establish causation of damages.  (Defs.' Mem. Supp. Defs.' Mot. Summ. J. 21-22).  At a minimum, there is a genuine factual dispute as to why Geology.com terminated its relationship with Broadspring.  According to Plaintiff, Geology.com removed Broadspring's advertising units because King reviewed the Lens after having been sent it Cosentino (Pl.'s Rule 56.1 Statement Response ¶ 77), an assertion that is supported by King's testimony (King Dep. 80:3-81:22), as well as an e-mail exchange between King and Alexander (Alexander Decl. Supp. Defs.' Mot. Summ. J., Ex. 41, at 14-18)  By contrast, Defendants point to other factors that may have caused Geology.com to stop working with Plaintiff (*see* Defs.' Mem. Supp. Defs. Mot.

Summ. J. 22), creating a factual dispute that is not appropriate for determination on summary judgment.  Further, Plaintiff is not required to prove actual sales diversion in order to obtain the injunctive relief that it seeks.  (Am. Compl. ¶ 24).  *See Johnson & Johnson v. Carter-Wallace, Inc.*, 631 F.2d 186, 191 (2d Cir. 1980) ("Likelihood of competitive injury sufficient to warrant a § 43(a) injunction has been found in the absence of proof of actual sales diversion in numerous cases.").  Accordingly, Plaintiff's Lanham Act claim survives.

### 3.    Plaintiff's Tortious Interference Claim

Finally, the Court addresses Plaintiff's tortious interference claim.  That claim is predicated on Defendants' alleged interference with Broadspring's relationship with Geology.com.  (Am. Compl. ¶ 28; Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 33-34).  Significantly, however, Plaintiff does not claim that Defendants caused the breach of an existing contractual relationship, but rather that they interfered with a prospective economic advantage. (Pl.'s Mem. Opp'n Defs.' Mot. Summ. J. 33-34 (citing Am. Compl. ¶ 28)).  *See, e.g.*, *Strapex Corp. v. Metaverpa N.V.*, 607 F. Supp. 1047, 1050 (S.D.N.Y. 1985) ("Interference with a plaintiff's business relations with a third party can be found if the plaintiff had a reasonable expectancy of a contract with the third party, which can result from mere negotiations." (internal quotation marks omitted)).  Accordingly, to establish its claim, Plaintiff must demonstrate that "(1) it had a business relationship with a third party; (2) the defendant knew of that relationship and intentionally interfered with it; (3) the defendant acted solely out of malice, or used dishonest, unfair, or improper means; and (4) the defendant's interference caused injury to the relationship."  *State St. Bank & Trust Co. v. Inversiones Errazuriz Limitada*, 374 F.3d 158, 171 (2d Cir. 2004) (internal quotation marks omitted).

As a threshold matter, the Court dismisses the tortious interference claim with respect to Defendant Nashed.  (*See* Defs.' Mem. Supp. Defs.' Mot. Summ. J. 23 n.10).  The basis for the tortious interference claim is that Cosentino sent the Lens to King at Geology.com, prompting King to terminate Geology.com's dealings with Broadspring.  (*See* King Dep. 74:9-78:2).  There is no suggestion, let alone evidence, that Nashed had any contact with King, was aware of Cosentino's dealings with King, or otherwise interfered with Broadspring's relationship with Geology.com.  (*See id.* 35:7-8 (Katz indicating that he is unfamiliar with Nashed)).  Accordingly, the tortious interference claim against Nashed must be dismissed.

With respect to Cosentino and Congoo, however, Defendants do not dispute that Plaintiff can satisfy the first two elements of a tortious interference claim.  (*See* Defs.' Reply Mem. Supp. Defs.' Mot. Summ. J. 14-15).  *See also Balance Point Divorce Funding, LLC v. Scrantom*, 978 F. Supp. 2d 341, 350-51 (S.D.N.Y. 2013) (holding that the plaintiff stated a claim for tortious interference with contract under a vicarious liability theory).  A reasonable jury could also find in Broadspring's favor on the third and fourth elements.  It is well-established, for example, that conduct that amounts to an independent tort constitutes "wrongful means" for purposes of a tortious interference claim, *Carvel Corp. v. Noonan*, 3 N.Y.3d 182, 190 (2004), and the Court has already declined to dismiss Plaintiff's claim for defamation.  Additionally, the Court has also concluded that a genuine dispute of material fact exists as to whether Defendants' statements to Geology.com caused the advertiser to terminate its relationship with Plaintiff.   Defendants' reliance on the "economic interest" defense does not affect that analysis.  (*See* Defs.' Mem. Supp. Defs.' Mot. Summ. J. 24-26; Defs.' Reply Mem. Supp. Defs.' Mot. Summ. J. 14-15).  To be sure, "procuring the breach of a contract in the exercise of equal or superior right is . . . justification for what would otherwise be an actionable wrong," *Foster v. Churchill*, 87 N.Y.2d

744, 750 (1996) (internal quotation marks and alterations omitted), and Congoo's exclusive

contract with Geology.com (*see* Alexander Decl. Supp. Defs.' Mot. Summ. J., Ex. 40; Pl.'s Rule

56.1 Statement Response ¶ 73) did indeed give it the right to protect its economic interest, *see*

*C.E.D. Mobilephone Commc'ns, Inc. v. Harris Corp.*, No. 81-CV-4651 (JFK), 1985 WL 193, at

*7 (S.D.N.Y. Jan. 14, 1985) ("[Defendant's] exclusive . . . agreement with [third party] . . . gives

[Defendant] the right to engage in otherwise wrongful interference with the . . . contract.").  The

means with which Congoo was permitted to protect its economic interest, however, were limited

to those not otherwise illegal, *see, e.g.*, *Felsen v. Sol Cafe Mfg. Corp.*, 24 N.Y.2d 682, 686

(1969); *see also Murtha v. Yonkers Child Care Ass'n*, 45 N.Y. 2d 913, 915 (1978) ("A corporate

officer who is charged with inducing the breach of a contract between the corporation and a third

party is immune from liability if it appears that he is acting in good faith as an officer and did not

commit independent torts . . ."), and here a reasonable jury could conclude that Defendants'

authorship and dissemination of the Lens — the very acts that allegedly caused Geology.com to

terminate its relationship with Broadspring — constituted defamation and Lanham Act false

advertising.  Accordingly, the economic interest defense may not be available to Defendants, and

Plaintiff's tortious interference claim survives with respect to Consentino and Congoo.

## B.  Congoo's Counterclaims

The Court turns now to Congoo's counterclaims, which allege that Broadspring made

false and misleading statements to Reader's Digest and Geology.com in an effort to procure their

business.  (Answer & Am. Countercls. ¶¶ 45, 48).  Specifically, Congoo alleges that Broadspring

made two such statements.  First, Congoo alleges that Broadspring misled the Publishers by

telling them that its advertisements, or "creatives," were much "cleaner" than Congoo's, and

failed to disclose — as required by FTC guidelines — that they are advertisements, and thus no

"cleaner."  (Defs.' Mem. Opp'n Pl.'s Mot. Summ. J. (Docket No. 136) 1; *see also* Defs.' Mem.

Supp. Defs.' Mot. Summ. J. 27-30).  Second, Congoo claims that Broadspring deceived the

Publishers by telling them that Broadspring offered a higher CPM than Congoo when, in fact,

"Broadspring [was] often unable to beat (or even meet) the CPMs paid by Congoo."  (Answer &

Am. Countercls. ¶ 48; Defs.' Mem. Opp'n Pl.'s Mot. Summ. J. 1).  Congoo alleges that, as a

result of making those statements, Reader's Digest and Geology.com sold Broadspring space on

their websites, in breach of exclusive agreements that Congoo had with the two publishers.

(Answer & Am. Countercls. ¶¶ 47, 50-51).  On the basis of that conduct, Congoo brings

counterclaims for both tortious interference and unfair competition.  (*Id.* ¶¶ 45-56).  Congoo now

seeks judgment in its favor on the unfair competition counterclaim.  (Defs.' Mem. Supp. Defs.'

Mot. Summ. J. 27-30).  Plaintiff cross-moves for summary judgment (or, alternatively, judgment

on the pleadings) with respect to both counterclaims.  (Docket No. 108).

 Plaintiff has the better of the argument.  Put simply, Congoo fails to adduce any evidence

suggesting that Plaintiff's conduct was "improper," as required for a tortious interference claim,

*see White Plains Coat & Apron Co. v. Cintas Corp.*, 8 N.Y.3d 422, 426 (2007), or that Plaintiff

acted in "bad faith," as required for an unfair competition claim, *see Jeffrey Milstein, Inc. v.*

*Greger, Lawlor, Roth, Inc.*, 58 F.3d 27, 35 (2d Cir. 1995).  Congoo argues that those respective

elements are met because Plaintiff's statements were "false" and "misleading" (Defs.' Mem.

Opp'n Pl.'s Mot. Summ. J. 11, 19), but no rational jury could reach such a conclusion.

Defendants characterize the "cleaner creatives" statement as misleading because it falsely

suggested that Broadspring's advertisements complied with FTC disclosure guidelines (*Id.*, at 1;

*see also* Defs.' Mem. Supp. Defs.' Mot. Summ. J. 27-30), but Congoo itself admits that the

phrase "clean creatives" has a "broad definition" that could refer to a number of different

features of the advertisement (Defs.' Mem. Opp'n Pl.'s Mot. Summ. J. 14-15).  Notably, there is

no evidence that representatives of Reader's Digest, Geology.com, or Broadspring understood

the phrase as Defendants interpret it.  (*See, e.g.*, Alexander Decl. Opp'n Pl.'s Mot. Summ. J.

(Docket No. 137), Ex. 8 ("Sottile Dep.") 67:7-16 (stating that "cleaner creatives" means "less

clutter" in the advertisement); Alexander Decl. Supp. Defs.' Mot. Summ. J., Ex. 7 ("Sanchez

Dep.") 68:11-69:2 (characterizing the "clean[liness]" of an advertisement as "the design of [the]

widget and the images that are displayed in the widget"); Alexander Decl. Supp. Defs.' Mot.

Summ. J., Ex. 7 ("Houck Dep.") 40:16-18 ("What do you mean by, 'cleaner'?" / "We don't do

belly-fat ads or electronic cigarette ads or work-from-home schemes."); *see also* King Dep. 71:5-

17; Alexander Decl. Opp'n Pl.'s Mot. Summ. J., Ex. 7 ("Kane Dep.") 86:25-87:6). [4]

 Further, Broadspring's representations regarding the CPM it pays publishers (*see, e.g.*,

Houck Dep. 26:2-6, 39:23-40:3) were, at most, non-specific, boastful statements regarding the

superiority of its product, statements that are non-actionable under unfair competition law. [5]  *See*

---

[4] In addition, to the extent that Congoo brings a claim based on Plaintiff's failure to
comply with FTC guidelines, "it is clear that no private right of action arises under [the Federal
Trade Commission] Act."  *Naylor v. Case & McGrath, Inc.*, 585 F.2d 557, 561 (2d Cir. 1978).

[5] It is not clear that the theory of Congoo's unfair competition claim is viable in the first
place.  "[T]he essence of an unfair competition claim under New York law is that the defendant
misappropriated the fruit of plaintiff's labors and expenditures by obtaining access to plaintiff's
business idea . . . through fraud or deception."  *Telecom Int'l Am. Ltd. v. AT&T Corp.*, 280 F.3d
175, 197 (2d Cir. 2001) (internal quotation marks omitted); *see also Eagle Comtronics v. Pico
Prods.*, 682 N.Y.S.2d 505, 506 (4th Dep't 1998) ("[T]he gravamen of a claim of unfair
competition is the . . . misappropriation of a commercial advantage belonging to another").
Although there is some authority in this Circuit for the proposition that an unfair competition
claim may be grounded in deception as well as misappropriation, *see Frink Am., Inc. v.
Champion Rd. Mach. Ltd.*, 216 F.3d 1072, 2000 WL 754945, at *3 (2d Cir. 2000) (summary
order) (noting that a claim for unfair competition under New York law "must be grounded in
*either deception or* appropriation of the exclusive property of the plaintiff" (quoting *H.L. Hayden
Co. v. Siemens Med. Sys., Inc.,* 879 F.2d 1005, 1025 (2d Cir. 1989)), that authority has been
called into question, *see Dayton Superior Corp. v. Marjam Supply Co.*, No. 07-CV-5215 (DRH),
2011 WL 710450, at *17-18 (E.D.N.Y. Feb. 22, 2011) (noting that the quoted language from
*H.L. Hayden* "did not represent the holding of the Second Circuit, but was taken from the circuit

*Time Warner, Inc. v. DIRECTV, Inc.*, 497 F.3d 144, 160 (2d Cir. 2007) (noting that "a general

claim of superiority over comparable products that is so vague that it can be understood as

nothing more than a mere expression of opinion" cannot form the basis of a false advertising

claim); *Stokely-Van Camp Inc. v. Coca-Cola Co.*, 646 F. Supp. 2d 510, 529-30 (S.D.N.Y. 2009)

(noting that a tagline was non-actionable puffery because it was "vague and non-specific"); *Julie*

*Research Labs., Inc. v. Gen. Resistance, Inc.*, 268 N.Y.S.2d 187, 189 (1st Dep't 1966), *aff'd*, 19

N.Y.2d 906 (1967) ("The defendant's advertisements, amounting to no more than a claim in

general terms of superiority of its product over the products of competitors, constitute mere

'puffing' and are not actionable.").  Similarly, the statements fall far short of the degree of

impropriety required for a tortious interference claim, *see Guard-Life Corp. v. Parker Hardware*

*Mfg. Corp.*, 50 N.Y.2d 183, 189-90 (1980) (noting that "wrongful means . . . do not . . . include

persuasion alone although it is knowingly directed at interference with the contract"); *White*

*Plains Coat & Apron Co.*, 8 N.Y.3d at 427 ("Sending regular advertising and soliciting business

in the normal course does not constitute inducement of breach of contract.").[6]  Accordingly,

Defendants' counterclaims fail as a matter of law and must be dismissed.

---

court's recitation of the legal standard applied by the district court below," and collecting cases
holding that allegations of deception without misappropriation are insufficient to state a claim for
unfair competition).  The Court need not reach the question here, as the unfair competition
counterclaim fails for independent reasons.

[6]      Neither *Curren v. Carbonic Systems, Inc.*, 872 N.Y.S.2d 240 (3d Dep't 2009), nor
*Mahoney v. State of N.Y.*, 665 N.Y.S.2d 691 (3d Dep't 1997), upon which Defendants rely
(Defs.' Mem. Opp'n Pl.'s Mot. Summ. J. 12), suggests otherwise.  In *Curren*, the Court did not,
as Congoo represents, "reverse summary judgment on [the plaintiff's] tortious interference
claim" (*id.*), but rather reversed the lower court's dismissal of the plaintiff's *defamation* claim,
and actually affirmed the dismissal of the tortious interference claim as a "repetition of his
defamation claims."  *Curren*, 665 N.Y.S.2d at 244.  And while the *Mahoney* Court did affirm
the lower court's denial of summary judgment on a tortious interference claim where allegedly false
and misleading statements might have caused plaintiffs to lose a government contract, the record
— unlike that here — "could arguably [have] support[ed] a finding that some of the conduct and

## MOTIONS TO EXCLUDE EXPERT TESTIMONY

Next, the Court addresses the dueling motions to exclude expert testimony at trial.

(Docket Nos. 94, 102).  Defendants have offered the expert report of Lance James in support of

their motion for summary judgment, and, in rebuttal, Plaintiff has offered a report of its expert,

Marty Lafferty.  (*See* Pl.'s Mem. Law Supp. Mot. Strike Expert Report & Preclude Test. Lance

James (Docket No. 103) ("Pl.'s Exclusion Mem."), Ex. 1 ("James Report"); Decl. Martin C.

Lafferty ("Lafferty Decl."), Ex. A ("Lafferty Report")).  To the extent that the parties move to

strike the reports themselves, their motions are moot as the Court did not rely on the reports in

reaching its conclusions on their cross-motions for summary judgment.  Each side, however, also

moves to preclude the other side's expert from testifying at trial.  As the case will now proceed

to trial (absent settlement), those portions of the parties' motions are not moot.

The admissibility of expert testimony is governed by Rule 702 of the Federal Rules of

Evidence, which provides, in relevant part that "[a] witness who is qualified as an expert by

knowledge, skill, experience, training, or education may testify" to his opinion if:

> (a) the expert's scientific, technical, or other specified knowledge will help the
>     trier of fact to understand the evidence or to determine a fact in issue;
> (b) the testimony is based on sufficient facts or data;
> (c) the testimony is the product of reliable principles and methods; and
> (d) the expert has reliably applied the principles and methods to the facts of the
>     case.

Fed. R. Evid. 702.  In *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 597 (1993),

the United States Supreme Court defined the "gatekeeping role" of district courts with respect to

expert testimony, declaring that "the Rules of Evidence — especially Rule 702 — [ ] assign to

the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation

---

statements . . . were motivated solely by 'disinterested malevolence'" toward the plaintiffs.
*Mahoney*, 665 N.Y.S.2d at 694.

and is relevant to the task at hand." The Rule 702 inquiry is a "flexible" one that "depends upon the particular circumstances of the particular case at issue." *Floyd v. City of New York*, 861 F. Supp. 2d 274, 286 (S.D.N.Y. 2012) (internal quotation marks omitted). Although a district court should "admit expert testimony only where it is offered by a qualified expert and is relevant and reliable," *Cohalan v. Genie Indus., Inc.*, 10-CV-2415 (JMF), 2013 WL 829150, *3 (S.D.N.Y. Mar. 1, 2013) (internal quotation marks omitted), exclusion remains "the exception rather than the rule," *Floyd*, 861 F. Supp. 2d at 287 (internal quotation marks omitted).

## A. Plaintiff's Motion To Exclude the Testimony of Lance James

The Court first addresses Plaintiff's motion to exclude the testimony of Defendants' expert, Lance James, who offers opinions on whether MindSet "distributed spyware and adware during the period 2003-2005, including software titled 'FavoriteMan' and 'Netpals.'" (James Report 1). Plaintiff argues that James's testimony, or at least portions of it, should be excluded, for five reasons. First, Plaintiff argues that James's testimony is irrelevant, as he has not offered any assurance that the software he analyzed was actually software that Mindset distributed. (Pl.'s Exclusion Mem. 3-4). Second, Plaintiff disputes the reliability of James's opinions, arguing that he has not explained his methodologies, and that his opinions are *ipse dixit*. (*Id.* at 4-5). Plaintiff's third argument is that James offers inadmissible opinions about the mental states of the spyware programmers. (*Id.* at 6-7). Fourth, Plaintiff claims that James's opinions improperly "introduc[e] hearsay." (*Id.* at 5-6). And finally, Plaintiff contends that James's opinions about the relationships among Broadspring, Mindset, Addictive Technologies, and Vista Interactive are improper subjects for expert testimony. (*Id.* at 7).

Plaintiff's first argument, that James's testimony is irrelevant, is plainly meritless, as James's report speaks to the truth of Defendants' allegedly defamatory statements, which is

obviously at issue in this litigation.  *See* Fed. R. Evid. 401.  Even if Plaintiff's argument were

reframed as relating to the requirement of Rule 702 of the Federal Rules of Evidence that expert

testimony be "based on sufficient facts or data," Fed. R. Evid. 702(b), it would fail.  In general,

"[q]uestions over whether there is a sufficient factual basis for an expert's testimony may go to

weight, not admissibility."  *Cedar Petrochems., Inc. v. Dongbu Hannong Chem. Co., Ltd.*, 769 F.

Supp. 2d 269, 285 (S.D.N.Y. 2011) (internal quotation marks omitted).  That is certainly the case

here, where James has offered supplemental testimony explaining how he verified that the files

he analyzed were, in fact, "the files distributed by Mindset Interactive d/b/a Additive

Technologies."  (Decl. Lance James (Docket No. 128) ¶ 2(a)).  Plaintiff's citation of *General

Electric Co. v. Joiner*, 522 U.S. 136, 144-46 (1997), is therefore inapt, as in that case there was

no dispute over what carcinogens were analyzed in the epidemiological studies relied upon by

the expert.  (Pl.'s Reply Mem. Law Further Supp. Mot. Strike Expert Report & Preclude Test.

Lance James) (Docket No. 155) ("Pl.'s Exclusion Reply Mem.") 3).

Plaintiff's second argument is also unpersuasive.  Plaintiff contends that the James

Report is unreliable because it fails to explain the methodologies that James employed in

conducting his analysis, rendering it impossible to subject the report to any sort of testing.  (Pl.'s

Exclusion Mem. 4-5).  Although the James Report is far from a model of clarity, and it does not

define certain terms, the Court does not agree that it contains "no method whose reliability can

be tested."  *Fate v. Vill. of Spring Valley*, No. 11-CV-6838 (JPO), 2013 WL 2649548, at *4

(S.D.N.Y. June 13, 2013) (internal quotation marks omitted).  To the contrary, the report guides

the reader through each step of the analysis and indicates which findings suggested to James that

the programs behaved like spyware.  (*See, e.g.*, James Report 13 ("After bass.dll was installed

there was an extra executable installed . . . in the system32 directory . . . . The only files that

should be stored in this directory are system files that are installed onto the operating system by default . . . .")).  To the extent that Plaintiff] takes issue with James's conclusions, "they may be properly explored on cross-examination and go to [the] testimony's weight and credibility — not its admissibility." *Int'l Bus. Machs. Corp. v. BCG Partners, Inc.*, No. 10-CV-128 (PAC), 2013 WL 1775437, at *16 (S.D.N.Y. Apr. 25, 2013) (alteration and internal quotation marks omitted).

Third, the Court does not agree with Plaintiff's view that James's testimony improperly opines on people's states of mind.  It is true that James, at certain points in his report, uses terms such as "surreptitious" and "inconsideration."  (James Report 22-23; *see also* Pl.'s Exclusion Reply Mem. 10).  But the thrust of the report has nothing to do with the mental states of those who designed the alleged spyware, but rather concerns the nature of the programs analyzed.  *See Arista Records LLC v. Lime Grp. LLC*, 784 F. Supp. 2d 398, 414 (S.D.N.Y. 2011) (finding that the challenged expert had "not opined on the parties' state of mind, but rather ha[d] provided information on the *design* and *functionality* of the LimeWire program").  Indeed, it is unclear why Defendants would even seek to admit testimony about the states of mind of Mindset's programmers, as there is no indication in the record as to who the programmers were or why their mental states would be at all relevant in this litigation.  Accordingly, Plaintiff's third argument does not serve as a basis to preclude James's testimony either.

Fourth, although James does reproduce the results of Internet searches and other third-party statements in his report, that does not render all of his testimony inadmissible hearsay. Experts may not "simply transmit . . . hearsay to the jury," but they are permitted to rely on hearsay if "experts in the field reasonably rely on such evidence in forming their opinions." *United States v. Mejia*, 545 F.3d 179, 197 (2d Cir. 2008).  An expert relying on hearsay, however, "must form his own opinions by applying his extensive experience and a reliable

methodology to the inadmissible [hearsay] materials." *Id.* (internal quotation marks omitted). Here, in some portions of his report, James has relied on his specialized knowledge in the field of information security to synthesize information from his diverse sources and to form an opinion as to whether FavoriteMan or Netpals were, indeed, spyware.  (*See, e.g.*, James Report 24 ("I used the following well-respected and well-known publicly available sites to conduct automated binary analysis submissions to determine detection rates from the most commonly employed Anti-Virus software . . . I researched the industry standard blocklists . . . .")).  *Cf. Marvel Characters*, *Inc. v. Kirby*, 726 F.3d 119, 135-36 (2d Cir. 2013) (noting that a historian would be permitted to "helpfully synthesize dense or voluminous historical texts" or "offer background knowledge or context that illuminates or places in perspective past events"); *Linde v. Arab Bank, PLC*, 922 F. Supp. 2d 316, 332 (E.D.N.Y. 2013) (denying motion to exclude terrorism expert whose research was conducted solely on the Internet, but who "synthesize[d] th[e] material and pull[ed] together common themes in reaching his conclusions").  In those respects, his testimony is proper and Plaintiff's motion is without merit.

 At other points, however, James's report crosses the line into improper regurgitation of hearsay.  In particular, a substantial portion of the James Report is devoted to reproducing screenshots of archived Internet pages (James Report 31-40) in an effort to demonstrate that "Addictive Technologies was a MindSet Interactive Company in 2004, and was observed as owned by Broadspring in or about 2005," and that "Broadspring claimed ownership to Addictive Technologies and Mindset Interactive," (James Report 41).  Yet the significance of those archived pages to the relationships among Broadspring, Addictive Technologies, and Mindset Interactive is made no more apparent by James's testimony.  That is, as Plaintiff argues in its fifth point, that portion of James's testimony violates Rule 702's requirement that expert

testimony "help the trier of fact to understand the evidence or to determine a fact in issue." Fed. R. Evid. 702(a); *see also In re Fosamax Prods. Liab. Litig.*, 645 F. Supp. 2d 164, 173 (S.D.N.Y. 2009) ("[E]xpert testimony is not helpful if it simply addresses lay matters which the jury is capable of understanding and deciding without the expert's help." (internal quotation marks omitted)).  Put simply, James — an expert in information security — brings no expertise to bear on the legal relationships among Broadspring, Mindset, Addictive Technologies, and Vista Interactive; accordingly, he is precluded from offering any opinions regarding the relationships among them, and any archived Internet pages that Defendants seek to admit on that topic must be introduced through competent fact witnesses.

**B.  Defendants' Motion To Exclude the Testimony of Marty Lafferty**

Turning to Defendants' motion to exclude Lafferty's testimony, Defendants offer three arguments.  First, they argue that Lafferty is insufficiently qualified to testify on the subject matter of his report.  (Def. Congoo's Mem. Law Supp. *Daubert* Mot. Exclude Pl.'s Purported Spyware 'Expert' (Docket No. 95) ("Defs.' Exclusion Mem.") 6-9).  Second, they contend that Lafferty's opinions are inadmissible because his report improperly opines on James's credibility. (*Id.* 10-11).  And third, they allege that the report contains certain clerical errors — namely, that it is unsigned, does not include a list of Lafferty's publications as required by Rule 26(a)(2)(B) of the Federal Rules of Civil Procedure, and does not include a list of cases in which Lafferty has testified, as required by that same Rule.  (*Id.* 11-12).

Addressing the first argument, pursuant to Rule 702, a proffered expert must be qualified "by knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  "To determine whether a witness qualifies as an expert, courts compare the area in which the witness has superior knowledge, education, experience, or skill with the subject matter of the proffered

testimony." *United States v. Tin Yat Chin*, 371 F.3d 31, 40 (2d Cir. 2004). "The Second Circuit has taken a liberal view of the qualification requirements of Rule 702, at least to the extent that a lack of formal training does not necessarily disqualify an expert from testifying if he or she has equivalent relevant practical experience." *In re Rezulin Prods. Liab. Litig.*, 309 F. Supp. 2d 531, 559 (S.D.N.Y. 2004); *see also Peerless Ins. Co. v. Marley Engineered Prods. LLC*, No. 05-CV-4848 (AKT), 2008 WL 7440158, at *2 (E.D.N.Y. June 12, 2008) ("This Circuit has adopted a liberal standard for qualifying an expert and there is no requirement that a witness have formal education or training before being qualified as an expert." (citing *Nimely v. City of New York*, 414 F.3d 381, 396 (2d Cir. 2005))). "If an expert's training and experience is in a field closely related to the area to the proposed testimony, that may — in appropriate circumstances — be sufficient to meet Rule 702's qualification standards." *SEC v. Tourre*, 950 F. Supp. 2d 666, 674 (S.D.N.Y. 2013).

In this case, Lafferty's expertise is derived from his experience as the Chief Executive Officer of the Distributed Computing Industry Association ("DCIA"), "an organization focused on fostering technological and commercial advancement of cloud computing, peer-to-peer . . . software, and related technologies." (Lafferty Decl. ¶ 1). The member companies of the DCIA include software developers to whom spyware and malware represent a significant concern, and Lafferty has testified that he is "directly involved in . . . find[ing] ways to eliminate and protect against 'spyware' and other types of 'malware.'" (*Id.* ¶¶ 2-3). In addition, Lafferty has served as the intermediary between federal agencies, on the one hand, and DCIA member companies, on the other, "where the subject matter was software analysis and the development of assurances that no 'malware' was present." (*Id.* ¶ 7). Perhaps most significantly, Lafferty "contributed substantially" (albeit almost a decade ago) to an FTC multi-day workshop aimed at

defining the terms "spyware, malware, and adware," definitions that are still "considered to be the industry standard today."  (*Id.* ¶ 8).

The Court concludes that such experience is sufficient to qualify Lafferty as an expert to opine on the James Report's claim "that Mindset Interactive Inc. . . . distributed spyware during the period 2003-to-2005, and in particular [that] its FavoriteMan and NetPals software applications constituted spyware."  (Lafferty Report 1).  Defendants argue that Lafferty is not qualified to offer an opinion on that subject because he has no "computer science background or any other relevant technical knowledge that would permit him to analyze the Mindset Software" and because his professional experience in the field is not sufficiently substantial.  (Defs.' Reply Mem. Law Further Supp. *Daubert* Mot. Exclude Pl.'s Purported Spyware 'Expert' (Docket No. 152) ("Defs.' Exclusion Reply Mem.") 3-4).  But, as noted, a witness need not have any formal education or training before being qualified as an expert, so long as the expert is proffering an opinion on an issue that is within his area of expertise.  *Peerless*, 2008 WL 7440158, at *2; *see also McCullock v. H.B. Fuller Co.*, 61 F.3d 1038, 1043 (2d Cir. 1995) (holding that disputes over expert qualifications are "properly explored on cross-examination and [go] to [the] testimony's weight and credibility — not its admissibility").

The issues in the Lafferty Report are indeed within Lafferty's area of expertise, as much of the report concerns whether certain qualities that James observed about the analyzed software are indeed characteristic of spyware, a concept with which Lafferty is intimately familiar.  (*See, e.g.*, Lafferty Report 5-6 ("Contextual analysis, starting with James' Figure 1, which was provocatively labeled as 'McAfee Security Identifying NetPals as Spyware' reveals that, according to respected malware protection company Emsisoft (www.emsisoft.com), James' specifically selected file, 17odhr0b.exe, is actually a file within a program known as 'J-Ball'

distributed by the company Just Free Games (www.gametop.com) a completely separate

company from Mindset Interactive . . . .   Its threat level is considered by Emsisoft as 'low risk,'

and certainly not serious enough to be considered spyware."); *id.* 15 ("I respectfully disagree

with James that the packing of the relatively small 17b0drhr0b.exe file 'strongly suggests that it

is intended to obfuscate and hide the activity of the executable, such as surreptitiously install

software that is designed to hook directly into the browser.'  Rather, this can be viewed

alternatively as an elegant and efficient approach to designing software that has no more sinister

a purpose than to serve relevant advertising.")).  Accordingly, the Court will not exclude

Lafferty's testimony on those grounds.

Defendants' second and third objections are even less weighty.  Their argument that

Lafferty's report improperly opines on James's credibility is plainly meritless.  Indeed,

Defendants do not seem to understand the meaning of the term "credibility," as they suggest that

Lafferty's conclusion that the James Report offers "insufficient evidence to prove that the

software can reasonably be considered spyware" is somehow a challenge to James's credibility.

(Defs.' Exclusion Mem. 10 (alteration, emphasis, and internal quotation marks omitted)).  To the

contrary, Lafferty's report quite obviously criticizes the substance of James's report, and the fact

that Lafferty questions whether James analyzed the correct files does not mean that he has

"opine[d] on the credibility of evidence"; his report is simply "archetypal rebuttal testimony"

that "identifies a flawed premise in an expert report that casts doubt on . . . that report's

conclusions."  *Scientific Components Corp. v. Sirenza Microdevices, Inc.*, No. 03-CV-1851

(NGG) (RML), 2008 WL 4911440, at *2 (E.D.N.Y. Nov. 13, 2008); *see also Ross Univ. Sch.*

*Med., Ltd. v. Brooklyn-Queens Health Care, Inc.*, No. 09-CV-1410 (KAM), 2012 WL 6091570,

at *7 (E.D.N.Y. Dec. 7, 2012) (describing a rebuttal report that "object[ed] to [the opposing expert's] methodology").

Finally, the Court will not exclude Lafferty's testimony because of the three technical failings that Defendants have identified.  Putting aside who is to blame for those failings (*compare* Pl.'s Mem. Law. Opp'n Defs.' Mot. Exclude Expert Test. Martin C. Lafferty (Docket No. 130) ("Pl.'s Mem. Opp'n Exclusion") 6, *with* Defs.' Exclusion Reply Mem. 9), any harm incurred by Defendants as a result of those failings has been minimal, and certainly would not justify the relatively harsh sanction of exclusion.  *Croom v. W. Conn. St. Univ.*, 218 F.R.D. 15, 18 (D. Conn. 2002) ("The remedy of preclusion is not to be employed as a 'paper tiger' with parties capitalizing on technical mistakes in discovery, but rather should be employed sparingly when the circumstances demand such a drastic measure.").  Plaintiff has remedied the signature defect, and the only incidental costs that Defendants claim to have incurred are minimal costs for "independently research[ing] information that should have been provided by Plaintiff."  (Defs.' Exclusion Reply Mem. 10).[7]  The Court is unpersuaded by that claim, not only because Defendants provide no documentation of their costs, but also because Defendants do not specify what additional information Plaintiff should have provided, particularly in light of Lafferty's testimony that he has not testified as an expert in the past four years and thus was not obligated to provide additional information about his background.  (Lafferty Decl. ¶ 10).  Accordingly, Defendants' motion to exclude Lafferty's testimony is denied.

---

[7]     Although Defendants request that the Court direct Plaintiff to pay Defendants' costs for filing the motion to exclude Lafferty's testimony because Plaintiff offers "no legitimate reason why it omitted Lafferty's signature, relevant experience and list of publications," the Court will not do so, especially because most of Defendants' motion was unrelated to those particular defects.  (Defs.' Exclusion Reply Mem. 10 n.5).

## MOTIONS FOR SANCTIONS

Next, the Court addresses Plaintiff's motions for sanctions. As noted, Plaintiff makes two such motions. First, pursuant to this Court's Order of October 16, 2013 (Docket No. 60), Plaintiff moves *in camera* for re-designation of certain documents produced and designated by Defendants as AEO, as well as associated attorney's fees and costs. Second, Plaintiff moves for sanctions due to Defendants' alleged spoliation of evidence — namely, the failure to preserve certain Instant Messages ("IMs"). (Docket No. 98).

### A.  The Re-Designation Motion

Plaintiff's first motion is based on the Confidentiality Stipulation and Protective Order (the "Protective Order"), which was so ordered by the Court on May 17, 2013. (Docket No. 34). The Order provides for two levels of confidentiality: documents designated "Confidential," which may be shared with clients for use only in connection with this litigation; and documents designated "Highly Confidential — Attorneys' Eyes Only," which may be viewed only by the parties' outside counsel of record in this case (and by certain experts and others). (*Id.* §§ 2.3, 2.4, 7.2, 7.4). By its terms, the Protective Order strictly limits the latter designation to "extremely sensitive Confidential Information or Items whose disclosure to another Party or nonparty would create a substantial risk of serious injury that could not be avoided by less restrictive means." (*Id.* § 2.4). In addition, the Protective Order provides that the designating party "must take care to limit any such designation to specific material that qualifies under the appropriate standards," and "to designate for protection only those parts of . . . documents . . . that qualify." (*Id.* § 5.1). Significantly, in the event of a dispute over any designations, the Protective Order imposes the "burden of persuasion . . . on the Designating Party." (*Id.* § 6.3). Moreover, the Protective Order expressly provides that "[d]esignations that are shown to be

clearly unjustified, or that have been made for an improper purpose (e.g., to unnecessarily encumber or retard the case development process, or to impose unnecessary expenses and burdens on other parties), may expose the Designating Party to sanctions." (*Id.* § 5.1).

On October 7, 2013, Plaintiff filed a letter motion requesting a conference regarding, *inter alia*, Defendants' alleged misuse of the AEO designation. (Docket No. 53). Notably, this was not the first time that Plaintiff had raised the issue; on July 19, 2013, Plaintiff protested Defendants' designation of certain documents as AEO (Docket No. 42), in response to which Defendants voluntarily removed the AEO designation on some of those documents (Docket No. 41).[8] Prompted by Plaintiff's October 7, 2013 letter, the Court held a conference on October 16, 2013. (Docket No. 60). At the conference, Defendants admitted that they had continued to inappropriately mark certain documents AEO, and that they would re-designate those documents accordingly. (Docket No. 67, at 6:20-22). That same day, the Court issued an Order directing Defendants to review all documents they had designated as AEO, and to re- or de-designate any such documents as appropriate by October 23, 2013. (Docket No. 60). In the event that Plaintiff believed that documents remained improperly designated AEO, Plaintiff was to submit the relevant documents to the Court for *in camera* review. (*Id.*). The Court cautioned Defendants that "[i]f there is a single line that is properly designated AEO," that would not justify "withhold[ing] the entire document as AEO." (Docket No. 67, at 11:14-16). More significantly, the Court explicitly warned that if it disagreed with Defendants' designations, "there [would] be

---

[8]   Defendants re-designated and re-produced documents that had been improperly designated AEO on other occasions, without Court intervention. Defendants themselves admit that, in total, they re-designated and re-produced documents on nine separate occasions between July and October 2013. (Defs.' Mem. Opp'n Pl.'s Mot. Re-Designation Documents & Sanctions ("Defs.' Re-Designation Opp'n Mem.") 2 n.1).

consequences," including "whatever fees [Plaintiff has] incurred in order to address the issue, including whatever motion practice is necessary in connection with this."  (*Id.* at 9:4-8).

Remarkably, as a result of that court-ordered review, Defendants re-designated an additional 780 documents, effectively conceding that a large number of their designations — even after multiple rounds of review — had been improper.  (Pl.'s Mem. Law Supp. Re-Designation Defs.' Documents & Sanctions ("Pl.'s Re-Designation Mem.") 2; Defs.' Re-Designation Opp'n Mem. 2).  More than 1,000 documents allegedly remain designated AEO (Defs.' Re-Designation Opp'n Mem. 2), of which Plaintiff now challenges approximately nineteen (totaling approximately fifty-eight pages).[9]  Having reviewed those documents, and the parties' respective memoranda, the Court concludes that many of the documents at issue remain improperly designated AEO.  For instance, Defendants designated AEO an entire e-mail thread among Congoo employees discussing their concerns about publishers that were "dropping like flies."  (C00007052-7054).  Only small excerpts from these e-mails — specifically, the portions discussing the terms of Congoo's agreements with publishers (*see, e.g.*, C00007053 (stating the notice period for termination of certain accounts)) — could even plausibly be construed as containing "extremely sensitive" information, but Defendants designated the whole thread AEO. Notably, Defendants all but admitted that such a blanket designation was improper, stating in their memorandum that "[m]ultiple numbers and sentences would need to be redacted to re-designate" the document.  (Defs.' Re-Designation Opp'n Mem. 4).

---

[9]     Plaintiff suggests that the number of improperly designated documents is significantly higher, but alleges that it has focused its motion on a subset of more significant documents so as "not to burden the Court."  (Pl.'s Re-Designation Mem. 3).  Some of the documents challenged by Plaintiff in its initial memorandum — namely, C00010997, C00007393-94, and C00014005-08 (*id.* at 4) — are no longer at issue.  In conjunction with their opposition, Defendants re-designated and re-produced C0010997, explaining that they had inadvertently failed to produce it earlier; Defendants had previously re-designated the other documents — a fact inadvertently overlooked by Plaintiff.  (Defs.' Re-Designation Opp'n Mem 6 & n.3).

Defendants make a similar admission with respect to an e-mail from Cosentino notifying Reader's Digest that it was in breach of its agreement, acknowledging that the document could be re-designated confidential so long as "[m]ultiple sentences" were redacted.  (Defs.' Re-Designation Opp'n Mem. 4; *see also* C00013447).  In the Court's judgment, even that admission does not go far enough.  There is arguably one contractual term in the e-mail that could be considered sensitive and justify redaction (namely, the penultimate sentence of the second paragraph of text), but that does not justify designating "[m]ultiple sentences," let alone the entire e-mail, AEO.  To provide just one more example: Plaintiff points to a document displaying two screenshots — one from a Congoo website and the other from a Broadspring website — where the text that compares the appearance of the two images was redacted as AEO.  (Pl.'s Re-Designation Mem. 6; *see also* C00008758).  It strains credulity to assert, as Defendants do, that that text is "extremely sensitive" information; it is certainly not, as Defendants assert, "internal strategy and analysis of competition" that would justify an AEO designation.  (Defs.' Re-Designation Opp'n Mem. 7).

More broadly, putting aside isolated references in the documents at issue to the terms of agreements with customers and the like, Defendants fail to carry their burden of persuasion that any of the designations at issue are proper.  (Indeed, they fail even to acknowledge that it is their burden, taking Plaintiff to task for allegedly failing to show that disclosure of the documents at issue would not harm them.  (Defs.' Re-Designation Opp'n Mem. 5).)  Over and over again, Defendants merely assert, in conclusory fashion, that the designations and redactions at issue are proper because the information concerns "client acquisition strategy," "client retention strategy," "internal strategy and analysis of competition," "client descriptions," or "terms of its client agreement."  (*See, e.g.*, *id.* at 4, 7).  Such perfunctory explanations, however, fall far short of

satisfying Defendants' burden of showing that disclosure of the redacted material "would create a *substantial* risk of serious injury that could not be avoided by less restrictive means." (Protective Order § 2.4 (emphasis added)).

Accordingly, to the extent that Defendants have not already done so, they are ORDERED to re-designate as Confidential and re-produce to Plaintiff the following documents within **one week** of the date of this Opinion and Order: C00013033-38, C00013436, C00013447-48, C00014365-66, C00014377-79, C00007207, C00014396-99, C00014781-82, C00007052-54, C00002131-43, C00006889-91, and C00011149-54.  If Defendants believe that redactions to those documents are justifiable, they may make such redactions, subject to the understanding that Plaintiff may challenge the redactions and mindful that the Court is unlikely to approve redactions that go beyond specific references to contractual terms, rates (including but not limited to CPM information), and performance references.  Moreover, Defendants are cautioned that, in the event that the redactions are found to be improper, they may be ordered to pay the attorney's fees and costs associated with that additional litigation.  If Defendants make such redactions, any challenges by Plaintiff to the redactions shall be made to the Court within **two weeks** of the date of this Opinion and Order, and Defendants' reply, if any, shall be made within **three weeks** of the date of this Opinion and Order.  Additionally, Defendants are ORDERED to re-designate the redactions on the following documents from AEO to Confidential and to re-produce the documents to Plaintiff within **one week** of the date of this Opinion and Order: C00008156, C00008758, C00008680, C00000383, and C00011121.

Pursuant to the terms of the Protective Order, as well as the Court's inherent authority under Rule 37 of the Federal Rules of Civil Procedure, Plaintiff is also entitled to reasonable attorney's fees and costs incurred as a result of Defendants' improper AEO designations,

including the fees and costs associated with bringing this motion for sanctions.  (Protective Order
§ 5.1 ("Designations that are shown to be clearly unjustified . . . may expose the Designating
Party to sanctions.")).  *See Del Campo v. Am. Corrective Counseling Servs., Inc.*, No. 01-CV-
21151 (PVT), 2007 WL 3306496, at *4 (N.D. Cal. Nov. 6, 2007) ("The failure to obey a
protective order's prohibition against indiscriminate designations is covered by Rule 37."); *In re
ULLICO Inc. Litig.*, 237 F.R.D. 314, 317-19 (D.D.C. 2006) (ordering a party to pay its
opponent's expenses and fees incurred in filing a successful motion challenging the over-
designation of documents as confidential).  The fact that Defendants' designations were "clearly
unjustified," by itself, warrants the imposition of sanctions under the Protective Order.
(Protective Order § 5.1).  Sanctions are even more appropriate in view of Defendants' abuse of
the AEO designation throughout the discovery process.  As noted above, Defendants re-
designated and re-produced documents on nine separate occasions — including, most notably,
780 documents that were re-designated only after evidence of some patently improper
designations prompted the Court, on Plaintiff's application, to order Defendants to engage in a
wholesale review of all documents it had designated AEO.  Plaintiff shall submit its application
for reasonable costs and fees, with supporting contemporaneous documentation, within **two
weeks** of the date of this Opinion and Order.  Defendants must submit any opposition within
**three weeks** of the date of this Opinion and Order.

Finally, although the Court recognizes that the documents at issue are confidential and
are thus not appropriate to be placed in the public record, it sees no reason why the memoranda
of law the parties filed in support of and in opposition to the instant re-designation motion should
remain under seal, as the memoranda appear to contain only general descriptions of the
documents rather than the confidential information itself.  As those memoranda are "relevant to

the performance of the judicial function and useful in the judicial process," they qualify as

"judicial documents" to which the common law right of public access attaches.  *Lugosch v.*

*Pyramid Co. of Onondaga*, 435 F.3d 110, 119 (2d Cir. 2006) (internal quotation marks omitted).

Accordingly, the parties are ordered to show cause in writing, within **two weeks** of the date of

this Opinion and Order, why their memoranda of law with respect to this motion should remain

under seal or in redacted form.  Any replies shall be filed within **three weeks** of the date of this

Opinion and Order.  In the absence of a showing that the memoranda of law should remain under

seal, the parties shall promptly file them on ECF.  The Clerk of Court is directed to file and

maintain the documents at issue under seal pending further order of the Court.

## B.  The Spoliation Motion

Plaintiff's second motion for sanctions is based on Defendants' alleged spoliation of

evidence.  (Docket No. 98).  In particular, it is based on Defendants' October 2, 2013 admission

that Congoo custodians Rafael Cosentino, Ian Kane, and Jack Wagner had not been preserving

IMs sent from their Yahoo! IM accounts, in violation of this Court's Stipulation and Order for

the Preservation of Documents (the "Preservation Order"), entered on March 25, 2013.  (Katz

Decl. Supp. Pl.'s Mot. for Sanctions (Docket No. 101), Ex. 8; Pl.'s Mem. Supp. Mot. Sanctions

(Docket No. 99); *see also* Docket Nos. 10, 24).  In addition to attorney's fees and expenses,

Plaintiff requests that the Court give an adverse inference jury instruction because of

Defendants' misconduct.  (Pl.'s Mem. Supp. Mot. Sanctions 1).

"Spoliation is the destruction or significant alteration of evidence, or the failure to

preserve property for another's use as evidence in pending or reasonably foreseeable litigation."

*Cohalan*, 2013 WL 829150, at *8 (internal quotation marks omitted).  "[A] party seeking an

adverse inference instruction based on the destruction of evidence must establish (1) that the

party having control over the evidence had an obligation to preserve it at the time it was

destroyed; (2) that the records were destroyed with a culpable state of mind; and (3) that the

destroyed evidence was relevant to the party's claim or defense such that a reasonable trier of

fact could find that it would support that claim or defense." *Residential Funding Corp. v.

DeGeorge Fin. Corp.*, 306 F.3d 99, 106 (2d Cir. 2002) (internal quotation marks omitted).  The

burden of establishing those elements falls on the party seeking sanctions — here, Plaintiff.

*Byrnie v. Town of Cromwell*, 243 F.3d 93, 109 (2d Cir. 2001).   "The determination of an

appropriate sanction for spoliation, if any, is confined to the sound discretion of the trial judge,

and is assessed on a case-by-case basis." *Shrenuj USA, LLC v. Rosenthal & Rosenthal, Inc.*, No.

12-CV-4827 (JMF), 2014 WL 1226469, at *7 (S.D.N.Y. Mar. 25, 2014) (internal quotation

marks omitted); *see also Valentini v. Citigroup, Inc.*, No. 11-CV-1355 (JMF), 2013 WL

4407065, at *2 (S.D.N.Y. Aug. 16, 2013) (noting the district court's "broad discretion" to

fashion appropriate sanctions for discovery violations).

　　　　With respect to the first element, there is no question that Defendants were under an

obligation to preserve the IMs at issue.  The Court's Preservation Order explicitly required the

preservation of "[a]ll . . . instant messaging . . . related to this dispute" (Docket No. 10, ¶ 2(c)),

and Plaintiff has adduced substantial evidence showing that Congoo employees use their Yahoo!

IM accounts extensively for work-related purposes and that some such Yahoo! IMs are relevant

to this lawsuit.  (*See, e.g.*, Katz Decl. Supp. Pl.'s Mot. for Sanctions, Ex. 10 ("Kane Dep. II")

146:7-13 (Kane testifying that most Congoo employees, including everyone in business

development, is required to use Yahoo! Instant Messenger); Katz Decl. Supp. Pl.'s Mot. for

Sanctions, Ex. 15 (IM from Cosentino to Nashed containing the URL of the Lens)).

Turning to the second element, the Court finds that Defendants acted with gross negligence.  Defendants' counsel represented to the Court on April 9, 2013, that they and Nashed were aware of the terms of the Preservation Order (Docket No. 56, at 15:9-12), and even indicated that Nashed had advised "Mr. [K]ane and Mr. Cosentino to not delete, remove anything from their computers," and that "[Nashed] went and spoke to them, personally, to ensure that no information relevant to this case would be deleted," (*id.* at 15:22-16:2).  Yet the record makes clear that, in reality, Nashed failed to ensure that Kane and Cosentino understood their obligations under the Preservation Order, which required Defendants to take "all reasonable steps to preserve and retain" all electronically stored information.  (Docket No. 10, §1).  Remarkably, Cosentino admitted at his deposition that he did not even consider that his preservation obligations required him to take steps regarding his Yahoo! IM account, and he did not investigate whether the settings on his account — or any other account at Congoo — should have been changed until months after this case commenced.  (Cosentino Dep. 21:3-12, 22:13-22, 23:4-14).  Likewise, Kane testified that he "never looked into" whether his IMs were being preserved because it was "never really important to [him]."  (Kane Dep. II, 147:21-148:9).  Although the Court is not persuaded that Defendants' failures were a "conscious decision" (Pl.'s Mem. Supp. Mot. Sanctions 10), their cavalier attitude toward their preservation obligations is inexcusable.  *See Orbit One Commc'ns, Inc. v. Numerex Corp.*, 271 F.R.D. 429, 441 (S.D.N.Y. 2010) ("[A]fter a discovery duty is well established, the failure to adhere to contemporary standards can be considered gross negligence." (internal quotation marks omitted)).

Plaintiff has failed, however, to carry its burden with respect to the third element.  Where the destruction of evidence is found to be willful, courts presume the relevance of the destroyed evidence, *see Sekisui Am. Corp. v. Hart*, 945 F. Supp. 2d 494, 504 (S.D.N.Y. 2013), but where

the party against whom sanctions are sought engages only in gross negligence, a court may, but is not required to, presume the relevance of the evidence, *see Chin v. Port Auth. of N.Y. & N.J.*, 685 F.3d 135, 162 (2d Cir. 2012) ("[A] finding of gross negligence merely permits, rather than requires, a district court to give an adverse inference instruction."); *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 221 (S.D.N.Y. 2003) ("[O]nly in the case of *willful* spoliation is the spoliator's mental culpability itself evidence of the relevance of the documents destroyed."). Here, Plaintiff has not submitted independent proof of the IMs' relevance; instead, it simply argues that because other IMs that were produced were favorable to its case, and because Defendants regularly use IMs to communicate about work-related matters, the unrecorded IMs must have been favorable to its case as well. (*See* Pl.'s Mem. Supp. Mot. Sanctions 8-10, 12). Without either direct proof or evidence suggesting that Defendants' conduct was willful, however, the Court declines to impose the "severe" sanction of an adverse inference. *Pension Comm. of Univ. of Montreal Pension Plan v. Banc of Am. Sec., LLC*, 685 F. Supp. 2d 456, 467 (S.D.N.Y. 2010); *see also Passlogix, Inc. v. 2FA Tech., LLC*, 708 F. Supp. 2d 378, 415 (S.D.N.Y. 2010) ("[T]he Court holds that although [Defendant] had a duty to preserve the [disputed e-mail] and was grossly negligent in deleting it, it did not engage in spoliation of evidence because [Plaintiff] has failed to establish that the e[-]mail would have been helpful to its claims or defenses or harmful to [Defendant's] claims or defenses."); *Zubulake*, 220 F.R.D. at 221-222 (declining to give an adverse inference instruction where it had not been proved that backup tapes lost by a "negligent — and possibly reckless" — party were relevant).

Nevertheless, the Court still finds Defendants' conduct — particularly in light of Cosentino's and Kane's admitted failures to investigate whether their IM accounts were capable of recording or did, in fact, record messages — sanctionable. Accordingly, Defendants are

ordered to reimburse Plaintiff for the fees and expenses it incurred in pursuing Cosentino's,

Kane's, and Wagner's IMs, as well as for the fees and expenses incurred in prosecuting this

motion for sanctions. *See, e.g.*, *Toussie v. Cnty. of Suffolk*, No. 01-CV-6716 (JS) (ARL), 2007

WL 4565160, at *9-10 (E.D.N.Y. Dec. 21, 2007) (finding an adverse inference instruction

unwarranted, but awarding costs to moving party). Plaintiff shall submit its application for

reasonable costs and fees (jointly with its application for fees and costs associated with the re-

designation motion), with supporting contemporaneous documentation, within **two weeks** of the

date of this Opinion and Order. Defendants must submit any opposition (jointly with its

opposition to any application for fees and costs associated with the re-designation motion) within

**three weeks** of the date of this Opinion and Order.

## MOTION FOR LEAVE TO AMEND

Finally, the Court addresses Plaintiff's motion for leave to file a Second Amended

Complaint. (Docket No. 75). Under Rule 15 of the Federal Rules of Civil Procedure, "a party

may amend its pleading only with the opposing party's written consent or the court's leave. The

court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Because

Plaintiff moves to amend after a court-ordered deadline (*see* Docket No. 25), however, Plaintiff

must also demonstrate "good cause" for the amendment. Fed. R. Civ. P. 16(b)(4).[10] "'Good

cause' depends on the diligence of the moving party." *Parker v. Columbia Pictures Indus.*, 204

---

[10]   Pointing to this Court's standard Case Management Plan, which was entered on April 9, 2013 (Docket No. 25), Defendants contend that Plaintiff has to meet an even higher standard — showing "exceptional circumstances" — to amend at this point. (Defs.' Mem. Law Opp'n Pl.'s Mot. To Amend (Docket No. 82) 2-3). That contention rests on a blatant misreading of the Case Management Plan, which specifies that "[a]bsent exceptional circumstances," the *deadline* for filing motions to amend (after which the "good cause" standard applies) may not be "more than thirty . . . days following the initial pretrial conference." (Docket No. 25 ¶ 4 (emphasis omitted)). That is, the "exceptional circumstances" language limits the parties' freedom to select a deadline; it has nothing to do with the standard to be applied to motions for leave to amend.

F.3d 326, 340 (2d Cir. 2000).  Specifically, the moving party "must demonstrate that it has been diligent in its efforts to meet the Court's deadlines," and that "despite its having exercised diligence, the applicable deadline could not have been reasonably met."  *Sokol Holdings v. BMD Munai, Inc.*, No. 05-CV-3749 (DF), 2009 WL 2524611, at *7 (S.D.N.Y. Aug. 14, 2009).  "A party fails to show good cause when the proposed amendment rests on information that the party knew, or should have known, in advance of the deadline."  *Perfect Pearl Co., Inc. v. Majestic Pearl & Stone, Inc.*, 889 F. Supp. 2d 453, 457 (S.D.N.Y. 2012) (internal quotation marks omitted).  Finally, leave to amend "may properly be denied for . . . undue prejudice to the opposing party by virtue of allowance of the amendment."  *Ruotolo v. City of New York*, 514 F.3d 184, 191 (2d Cir. 2008) (internal quotation marks omitted).

In this case, the Second Amended Complaint does not add any new causes of action; instead, it simply provides more detailed factual allegations regarding both the role that Nashed played in disseminating the Lens and Defendants' alleged continued dissemination of the Lens after the commencement of this action.  (Pl.'s Mem. Law Supp. Mot. To Amend (Docket No. 77) 2-3).  Moreover, it is clear that Plaintiff acted diligently in seeking leave to file an amended complaint, and could not have filed the Second Amended Complaint by the May 14, 2013 deadline to file amended pleadings.  In fact, Defendants did not even make their first document production — a production of only 116 pages — until June 2013 (Katz Decl. Supp. Mot. To Amend (Docket No. 76) ¶ 3), and Plaintiff's counsel repeatedly contacted Defendants' counsel and the Court regarding the status of Defendants' document productions in the following months (*id.* ¶¶ 4-11).  Defendants did not make their next production until August 21, 2013 (*id.* ¶ 8), a production that Defendants subsequently acknowledged was missing documents, including e-mails from Nashed and Cosentino (*id.*, Ex. 12).  In September and October 2013, Defendants

made a series of final supplemental productions, totaling nearly 10,000 additional documents, or

eighty percent of the total documents they produced in this case.  (Katz Decl. Supp. Mot. To

Amend ¶ 11).  As Plaintiff comprehensively documents, most of the new factual allegations in

the Second Amended Complaint are based on documents contained in those final supplemental

productions.  (Pl.'s Mem. Law Supp. Mot. To Amend 12-13).[11]  Accordingly, Plaintiff easily

establishes good cause to file the Second Amended Complaint.

     Having concluded that Plaintiff has shown good cause, the burden is on Defendants to

demonstrate that the proposed amendment would be prejudicial.  *See Amaya v. Roadhouse Brick*

*Oven Pizza, Inc.*, 285 F.R.D. 251, 253 (E.D.N.Y. 2012).  Defendants have not done so.  First,

Defendants' argument that they will be hindered in their ability to prepare their motion for

summary judgment is now moot, as Defendants already filed their motion for summary judgment

and the Court has denied it (based on the First Amended Complaint).  (*See* Defs.' Mem. Law

Opp'n Pl.'s Mot. To Amend 12-13).  In addition, the Court rejects Defendants' argument that

they need additional discovery to respond to the Second Amended Complaint.  (*See id.* 13-14).

This is not a case, such as *Colon v. Southern New England Telephone Co.*, No. 09-CV-0802

(CSH), 2012 WL 6568444, at *1-3 (D. Conn. Dec. 17, 2012), where the plaintiff seeks to add

---

[11]    Defendants argue that any new allegations based on documents produced by Defendants on October 11, 2013, are a result of Plaintiff's wrongful behavior.  The October 11th production consisted of documents dated after March 19, 2013, and Defendants contend that Plaintiff initially agreed to a March 19, 2013 cut-off date for document production, but then later rescinded that agreement, at which point Defendants made the production.  (Defs.' Mem. Law Opp'n Pl.'s Mot. To Amend 5, 9-10).  Having reviewed the relevant correspondence, however, the Court cannot conclude that Plaintiff agreed to such a cut-off date.  The negotiations over the date range appear to have been over the *start* date — rather than end date — for document production.  (*See* Zimmerman Decl. Opp'n Mot. To Amend (Docket No. 83), Ex. 2 ("[P]lease explain precisely which of the document you requests you propose to limit to March 20, 2012 *through the present*." (emphasis added))).  Defendants' argument that they understood Plaintiff to have agreed to such a cut-off is also undermined by the fact that they produced documents dated after March 19, 2013, well after the agreement is alleged to have been reached.  (*See* Katz Reply Decl. Supp. Mot. To Amend (Docket No. 87), Ex. 22).

entirely new causes of action to the complaint.  *See also Bruce Lee Enters., LLC v. A.V.E.L.A., Inc.*, No. 10-CV-2333 (KMW), 2013 WL 364210 (S.D.N.Y. Jan. 30, 2013) (denying motion to amend where defendants sought leave to add new affirmative defenses to their answer).  Instead, the Second Amended Complaint merely adds factual detail to support the existing causes of action in the Amended Complaint — detail that, it is worth noting, is derived entirely from Defendants' own document production and deposition testimony.  Defendants cannot plausibly argue that they "conducted discovery without knowing that these . . . allegations were at issue." *Colon*, 2012 WL 6568444, at *3; *see also In re Pfizer Inc. Sec. Litig.*, Nos. 04-CV-9866 (LTS) et al. 2012 WL 983548, at *2 (S.D.N.Y. Mar. 22, 2012) ("Courts routinely grant leave to amend when a plaintiff seeks to refine the complaint to reflect evidence obtained during discovery.").  Accordingly, Plaintiff's motion seeking leave to amend the complaint is GRANTED.[12]

The Second Amended Complaint submitted by Plaintiff includes certain redactions.  By letter filed under seal dated November 13, 2013, Plaintiff indicated to the Court that the reason that it had filed a redacted version was that the Second Amended Complaint referenced discovery materials that Defendants had designated AEO or Confidential, pursuant to the Protective Order.  In that same letter, Plaintiff stated that it did not, however, believe that any of the redacted content met the standard for being filed under seal.  Now that the Court has granted Plaintiff's motion to file the Second Amended Complaint, if Defendants still intend to oppose the filing of the Second Amended Complaint in unredacted form, they must submit a memorandum, not to exceed ten pages, within **one week** of the date of this Opinion and Order, explaining why the redactions are consistent with the presumption of public access to judicial documents.  *See*

---

[12]   For the same reasons, Defendants' request that discovery be reopened in the event that the Court grants Plaintiff leave to file the Second Amended Complaint is denied.  (Defs.' Mem. Law Opp'n Pl.'s Mot. To Amend 14-16).

*Lugosch*, 435 F.3d at 119.  Plaintiff may submit an opposition memorandum, also not to exceed ten pages, within **three weeks** of the date of this Opinion and Order.  If Defendants do not oppose the filing of the Second Amended Complaint in unredacted form within **one week** of the date of this Opinion and Order, Plaintiff shall promptly file an unredacted version of the Second Amended Complaint on ECF.

## SEALED DOCUMENTS

In addition to the Second Amended Complaint, many of the documents upon which the Court has relied in rendering this decision were filed under seal or in redacted form.  Those documents are listed in the Appendix that follows this Opinion and Order.  As noted, filings that are "relevant to the performance of the judicial function and useful in the judicial process" are considered "judicial documents," to which the common law right of public access attaches. *Lugosch*, 435 F.3d at 119 (internal quotation marks omitted).  Accordingly, the parties are ORDERED to show cause, in writing, why the listed documents should remain filed under seal or in redacted form, within **two weeks** of the date of this Opinion and Order.  Any replies shall be filed within **three weeks** of the date of this Opinion and Order.  If, within two weeks, neither party makes a filing arguing why a particular document should remain under seal, Plaintiff shall promptly file the relevant document on ECF in unredacted form.

## CONCLUSION

For the reasons stated above, Defendants' motion for summary judgment is denied except with respect to the tortious interference claim against Defendant Nashed, Plaintiff's motion for summary judgment is granted, Plaintiff's motion to exclude James's testimony is granted in part and denied in part, Defendants' motion to exclude Lafferty's testimony is denied, Plaintiff's motion for sanctions based on improper AEO designations is granted, Plaintiff's motion for

sanctions based on spoliation of evidence is granted in part and denied in part, and Plaintiff's

motion for leave to file a Second Amended Complaint is granted.  As a result of those rulings,

the only remaining claims are Plaintiff's claims against Congoo, Nashed, and Cosentino under

the Lanham Act and for defamation, and against Congoo and Cosentino for tortious interference.

As noted above, within **one week** of the date of this Opinion and Order, Defendants must

submit any opposition to the filing of the Second Amended Complaint in unredacted form, in a

memorandum not to exceed ten pages.  By that same date, Defendants must also re-designate the

above-referenced documents and produce them to Plaintiffs.  Within **two weeks** of the date of

this Opinion and Order, (1) Plaintiff must submit any challenges to redactions that Defendants

make to the re-designated documents; (2) Plaintiff must submit a consolidated application for

costs and fees related to the re-designation motion and the spoliation motion; and (3) either party

must submit any opposition to the public filing of a document listed in the Appendix to this

Opinion and Order, including the memoranda filed in support of and in opposition to the re-

designation motion.  Within **three weeks** of the date of this Opinion and Order, (1) Defendants

may submit any reply to Plaintiff's challenges to redactions to the re-designated documents; (2)

Defendants may submit any opposition to Plaintiff's application for costs and fees; (3) either

party may submit a reply regarding the public filing of a document listed in the Appendix, to the

extent that any opposition has been submitted in the first place; and (4) Plaintiff may submit a

reply to any opposition Defendants submit to the unredacted filing of the Second Amended

Complaint, in a memorandum not to exceed ten pages.

Under the Case Management Plan and Scheduling Order (Docket No. 13), the parties'

Joint Pretrial Order and all related filings required by the Court's Individual Rules and Practices

for Civil Cases are due thirty days from the date of this Opinion and Order.  In light of the

quantity and nature of the submissions that the parties need to make in the coming weeks, however, the Court will grant the parties **forty-five days from today**, rather than thirty, to make those submissions.  The parties should be prepared to go to trial approximately two weeks thereafter.  Moreover, the parties shall immediately advise the Court by joint letter if they are interested in a referral to the assigned Magistrate Judge for purposes of settlement.

The Clerk of Court is directed to terminate Docket Nos. 75, 94, 97, 98, 102, and 108.

SO ORDERED.

Dated: August 20, 2014
       New York, New York

JESSE M. FURMAN
United States District Judge

## APPENDIX

The Court relied on the following documents, which were filed in redacted form, in rendering this Opinion and Order:

- Docket No. 77 (Plaintiff's Memorandum of Law in Support of its Motion for Leave to File a Second Amended Complaint)
- Docket No. 82 (Defendants' Memorandum in Opposition to Plaintiff's Motion for Leave to File a Second Amended Complaint)
- Docket No. 86 (Plaintiff's Reply Memorandum in Further Support of its Motion for Leave to File a Second Amended Complaint)
- Docket No. 100 (Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment: (I) Dismissing Plaintiff's Claims for Defamation, False Advertising and Tortious Interference; and (II) Granting Defendant Congoo, LLC's Counterclaim for Unfair Competition)
- Docket No. 104 (Declaration of Ashraf Nashed)
- Docket No. 105 (Declaration of Rafael Cosentino)
- Docket No. 129 (Defendants' Memorandum in Opposition to Plaintiff's Motion for Sanctions Due to Alleged Spoliation of Evidence)
- Docket No. 136 (Defendant Congoo, LLC's Memorandum in Opposition to Plaintiff's Motion for Summary Judgment Or, Alternatively, Judgment On The Pleadings)
- Docket No. 138 (Defendant Congoo, LLC's Counterstatement of Disputed Facts Pursuant to Local Civil Rule 56.1)
- Docket No. 140 (Plaintiff's Memorandum of Law in Opposition to Defendants' Motion for Summary Judgment)
- Docket No. 141 (Declaration of Jonathan Markiles in Opposition to Defendants' Motion for Summary Judgment)
- Docket No. 144 (Plaintiff's Response to Defendants' Local Rule 56.1 Statement of Material Facts Not in Dispute)
- Docket No. 153 (Plaintiff's Reply Memorandum of Law in Further Support of its Motion for Sanctions Due to Spoliation of Evidence)
- Docket No. 158 (Defendants' Reply Memorandum of Law in Further Support of Their Motion for Summary Judgment (I) Dismissing Plaintiff's Claims for Defamation, False Advertising and Tortious Interference and (II) Granting Defendant Congoo, LLC's Counterclaim For Unfair Competition)

The Court relied on the following documents, which were filed under seal, in rendering this Opinion and Order:

- Docket No. 101, Ex. 10
- Docket No. 101, Ex. 15
- Docket No. 111, Ex. 3
- Docket No. 111, Ex. 40
- Docket No. 111, Ex. 41
- Docket No. 111, Ex. 7

- Docket No. 111, Ex. 8
- Docket No. 137, Ex. 7
- Docket No. 137, Ex. 8
- Docket No. 143, Ex. 11
- Docket No. 143, Ex. 12
- Docket No. 143, Ex. 13
- Docket No. 143, Ex. 14
- Docket No. 143, Ex. 18
- Docket No. 143, Ex. 19
- Docket No. 143, Ex. 32
- Docket No. 143, Ex. 5
- Docket No. 143, Ex. 6
- Docket No. 143, Ex. 7
- Docket No. 143, Ex. 8
- Plaintiff's Memorandum of Law in Support of Re-Designation of Defendants' Documents and Sanctions (reviewed *in camera*)
- Defendants' Memorandum in Opposition to Plaintiff's Motion for Re-Designation of Documents and Sanctions (reviewed *in camera*)
- Plaintiff's Reply Memorandum of Law in Further Support of Re-Designation of Defendants' Documents and Sanctions (reviewed *in camera*)