UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| BROADSPRING, INC.,<br><br>                    Plaintiff,<br><br>          v.<br><br>CONGOO, LLC, doing business as ADIANT<br>and ADBLADE, ASHRAF NASHED,<br>RAFAEL COSENTINO, and DOES 1-10,<br><br>                    Defendants. | 13 Civ. 1866 (JMF) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS'
MOTION *IN LIMINE* TO EXCLUDE EVIDENCE OF CONGOO'S
TOTAL GROSS REVENUES AND PROFITS AND PLAINTIFF'S
PROSPECTIVE CORRECTIVE ADVERTISING COSTS**

MOSES & SINGER LLP
*Attorneys for Defendants*

Philippe Zimmerman
Shari Alexander
The Chrysler Building
405 Lexington Avenue
New York, NY 10174-1299
Tel: (212) 554-7800  Fax: (212) 554-7700
pzimmerman@mosessinger.com
salexander@mosessinger.com

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ............................................................................... 1

STATEMENT OF RELEVANT FACTS ................................................................. 2

    A.    Congoo's Business Model Overview ............................................... 2

    B.    Broadspring's Alleged Damages Under the Lanham Act ..................... 3

    C.    The Narrow Universe of Publishers Alleged to Receive False Advertising.......... 4

ARGUMENT .......................................................................................................... 7

I.     THE COURT SHOULD EXCLUDE EVIDENCE OF CONGOO'S GROSS REVENUES AND PROFITS FROM PUBLISHERS WHO DID NOT RECEIVE THE ALLEGEDLY FALSE ADVERTISING ......................................... 7

    A.    Plaintiff Bears the Burden of Proving Defendant's Sales Attributable to the False Advertising ..................................................... 8

    B.    Evidence of Gross Revenues and Profits Not Related to the Alleged False Advertising Should be Excluded .................................... 12

    C.    Allowing Broadspring to Present the Jury with Inflated Gross Revenues and Profits Figures Bearing No Relationship to the Alleged False Advertising Would Be Highly Prejudicial to Defendants .................................. 13

II.    PLAINTIFF IS NOT ENTITLED TO FUTURE CORRECTIVE ADVERTISING ..... 15

CONCLUSION....................................................................................................... 16

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Ahava (USA), Inc. v. J.W.G., Ltd.*,
  286 F. Supp. 2d 321 (S.D.N.Y. 2003) ..............................................................11, 12

*Burndy Corp. v. Teledyne Indus., Inc.*,
  No. 04-CV-6017 (KMK) 2007 WL 2781246 (S.D.N.Y. Sept. 24, 2007) ..............8, 10, 11, 12

*Chamilia v. Pandora Jewelry, LLC*,
  No. 04-CV-6017 (KMK) 2007 WL 2781246 (S.D.N.Y. Sept. 24, 2007) ..............................13

*Dawe v. Corr. USA*,
  506 F. App'x 657 (9th Cir. 2013) ..............................................................15

*George Basch Co., Inc. v Blue Coral, Inc.*,
  968F.3d 1532 (2d Cir. 1992) ..............................................................8, 11, 14

*Gillette Co. v. Wilkinson Sword, Inc.*,
  No. 89 CV 3586 (KMW), 1992 WL 30938 (S.D.N.Y. Feb. 3, 1992) ....................................15

*Juicy Couture, Inc. v. L'Oreal USA, Inc.*,
  No. 04 Civ. 7203 (DLC) 2006 WL 1359955 (S.D.N.Y. May 18, 2006)................................16

*Lindy Pen Co., Inc. v. Bic Pen Corp.*,
  982 F.2d 1400 (9th Cir. 1993) ..............................................................10

*Lurzer GMBH v. Am. Showcase, Inc.*,
  75 F. Supp. 2d 98 (S.D.N.Y 1998) ..............................................................14, 15

*Nat'l Prods., Inc. v. Gamber-Johnson LLC*,
  734 F. Supp. 2d 1160 (W.D. Wash. 2010) ..............................................................11

*On Davis. MyPlayCity v. Conduit Ltd.*,
  No. 10 Civ. 1615(CM), 2013 WL 4105698 (S.D.N.Y. Aug. 12, 2013) ..................................10

*On Davis v. Gap, Inc.*,
  246 F.3d 152 (2d Cir. 2001) ..............................................................9, 14

*Optimum Tech., Inc. v. Henkel Consumer Adhesives, Inc.*,
  No. 1:04-cv-1082-TW, 2006 WL 1663357 (N.D. Ga. June 14, 2006)..................................10

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
  No. 02 Civ. 8046 WHP, 2004 WL 1658377 (S.D.N.Y. July 26, 2004) ..................................7

*Playtex Prods., Inc. v. Procter & Gamble Co.*,
　No. 02 Civ. 8096 (WHP) 2003 WL 21242769 (S.D.N.Y. May 28, 2003), *aff'd*, 126 F.
　App'x 32 (2d Cir. 2005) ........................................................................................................ 15

*Provident Life & Accident Inc. Co. v. O'Connor*,
　32 F. App'x. 821 (9th Cir. 2002) ......................................................................................... 14

*Rexall Sundown, Inc. v. Perrigo Co.*,
　707 F. Supp. 2d 357 (E.D.N.Y. 2010) ................................................................................ 10

*Scranton Gillette Commc'ns, Inc. v. Dannhausen*,
　No. 96C8353 1999 WL 558134 (N.D. Ill. July 27, 1999) .................................................. 13

*Simon & Schuster v. Dove Audio, Inc.*,
　970 F. Supp. 279 (S.D.N.Y. 1997) ...................................................................................... 12

*W.E. Bassett Co. v. Revlon, Inc.*,
　435 F.2d 656 (2d Cir. 1970) ................................................................................................ 8

*Zoll v. Ruder Finn, Inc.*,
　No. 02 Civ. 3652 (CSH), 01 Civ. 1339 (CSH), 2004 WL 527056 (S.D.N.Y. Mar. 16,
　2004) .................................................................................................................................... 14

## STATUTES

17 U.S.C. § 504(b) ....................................................................................................................... 9

15 U.S.C. § 1117(a) ................................................................................................................... 7, 8

## FEDERAL RULES

Fed. R. Evid. 403 ........................................................................................................................ 14

Defendants Congoo, LLC ("Congoo"), Ashraf Nashed and Rafael Cosentino (collectively, "Defendants"), respectfully submit this memorandum of law in support of their motion *in limine* to exclude evidence by Plaintiff Broadspring, Inc. ("Broadspring" or "Plaintiff") of Congoo's total gross revenues and profits. Defendants also seek to preclude Plaintiff from introducing evidence regarding its prospective corrective advertising costs.

## PRELIMINARY STATEMENT

This case concerns certain of Defendants' communications – alleged by Plaintiff to be false and defamatory – to a small universe of website operators, or "publishers." Out of the hundreds of thousands of online publishers, Broadspring identified nine in its Second Amended Complaint allegedly relevant to its Lanham Act cause of action. Yet in support of its request for damages in the form of disgorgement of Congoo's profits, Plaintiff seeks to present to the jury *all* of Congoo's gross revenues for a six month period, amounting to over ███████, and *all* of its gross profits over the same period, amounting to over ██████.

These inflated numbers should be excluded both because they are not supported by the law – which only allows for recovery of a defendant's profits that are *attributable to the false advertising* – and because, since they bear no causal connection to the alleged false advertising whatsoever and are so extreme, they are highly prejudicial to Defendants. Only evidence of gross revenues attributable to the limited universe of publishers to whom Plaintiff can show the allegedly false statements were made – under the most charitable interpretation to Broadspring, amounting to about ██████ – and gross profits on those revenues (amounting to, at most, about ██████ should be allowed. The burden would then shift to Congoo to deduct its costs (which would lower the maximum potential recovery to approximately ██████ and to show that the alleged false advertising had no relationship to such earnings.

Broadspring also seeks an additional $1.55 million in prospective corrective advertising costs based on an estimate it purportedly received from a strategic communications firm. This evidence likewise should be excluded because Broadspring is not entitled to recover such future corrective advertising costs as a matter of law.

## STATEMENT OF RELEVANT FACTS

### A.    Congoo's Business Model Overview

Congoo is a digital media technology company ("DMTC") operating in a market known as the "ad exchange," in which DMTCs purchase space from various publishers and sell that space to third party advertisers.[1] There are hundreds of thousands of possible publishers from which a DMTC can contract to purchase advertising space. (Alexander Dec., Ex. A at ¶ 7). Revenues are paid by the third party advertiser to the DMTC and shared with the publisher.

Congoo operates under several trade names, including Adiant and Adblade. (*Id.* at ¶ 2). Its competitors include Broadspring, Taboola, Google's Adsense, Outbrain, and many other DMTCs. (*Id.* at ¶ 10, Alexander Dec., Exs. B at 89:23-25, C at 20:5-6). Through Adblade, Congoo provides publishers with an ultra-premium ad-network with 100% branded content sites for advertisers and publishers. (Alexander Dec., Ex. A at ¶ 2). Among Congoo's innovations is the News Bullet® ad format, which is an advertisement with a thumbnail image and title or description that is hosted on a website. (*Id.* at ¶ 4). The News Bullet®, when clicked, leads a web-user to the advertiser's content and results in revenue generation.

Congoo employs two types of advertising placement – "Fixed Placement" ads and "Media Buys." (Alexander Dec., Ex. D at 181:4-22). Fixed Placement ads appear in a specified location on a website and are placed pursuant to a contract between Congoo and the publisher

---

[1] *See* Declaration of Shari Alexander in Support of Defendants' Motion *in Limine* to Exclude Evidence of Congoo's Total Gross Revenues and Profits and Plaintiff's Prospective Corrective Advertising Costs, sworn to on October 10, 2014 ("Alexander Dec."),Ex. A at ¶¶ 2 & 5.

called an Insertion Order ("IO"). *Id.* Congoo's IOs generally contain an exclusivity clause prohibiting publishers from running similarly formatted ads to the News Bullet®, as well as termination notice provisions (ranging from between 30 and 90 days). (*See, e.g.*, Alexander Dec., Ex. E). Pursuant to its IOs, Congoo shares a percentage of its third party advertiser revenues for Fixed Placement ads posted by a publisher; indeed, with the majority of the revenue typically received by the publisher. (*See, e.g., id.* at C00016345-46). In a Media Buy, ads rotate across different publishers in various locations on their webpages. In 2013, Congoo had Fixed Placement or Media Buys relationships with nearly 500 publishers. (Alexander Dec., Ex. F).

### B. Broadspring's Alleged Damages Under the Lanham Act

Plaintiff is seeking two forms of damages under the Lanham Act. First, it seeks to recover its own purported lost profits for the alleged false advertising from three publishers, which barely totals $5,000. (Alexander Dec., Ex. G, at 3). Dwarfing these supposed actual damages, Broadspring also seeks disgorgement of Congoo's profits based on the total gross revenues from all of the nearly 500 publishers with which Congoo did business over a six month period (March-August 2013) – irrespective of whether or not such publishers were exposed to the alleged false advertising, let alone influenced by such advertising. (*Id.*). Plaintiff thus seeks to present the jury with Congoo's total, company-wide gross revenues of over ██████████ and gross profits on those revenues of over ████████. (*Id.*).

C.      **The Narrow Universe of Publishers Alleged to Receive False Advertising**

Plaintiff's initial complaint identified two publishers – Geology.com and TechMedia – to which allegedly false advertising in the form of the Squidoo Lens was directed.[2]   Submitted as an exhibit to Plaintiff's Motion for Leave to Amend on November 13, 2013, five days before the close of discovery, Plaintiff's Second Amended Complaint added seven more publishers, for a total of nine:  Geology.com, the New York Daily News, Intermarkets, Inc., the New Hampshire Union Leader, Talking Points Memo, Tech Media Network, Slate, Digital First Media, and Journal Register Company.  (*See* Alexander Dec. Ex. K at ¶¶ 25 & 31).  All of these publishers had Fixed Placement relationships with Congoo.  (*See* Ex. E).[3]  The gross revenue for these nine, if taken for the unjustifiably long period of six months, is less than ███████ with gross profits of approximately ███████.[4]  (Alexander Dec. Ex. L).  When a pro rata share of Congoo's costs is allocated to these nine publishers, the maximum accounting that Broadspring could recover as disgorgement under the Lanham Act is less than ██████.  (*Id.*)

---

[2]    The Squidoo Lens was viewed 85 times in total (Alexander Dec., Ex. H).  These views include multiple viewings from Broadspring (and its directors, employees and attorneys) and Mr. Cosentino's efforts to amend the Lens.  (*See* Alexander Dec. Exs. C at 84:23-85:8, I, J at 144:11-149:1). There is no evidence that any specific publisher viewed the Lens, much less of any resulting damage to Broadspring.

[3]    Only three of the alleged nine publishers did not have IOs with Congoo; two publishers – Slate and Talking Points – were not working with Congoo and did not generate any revenues or profits during the relevant period.  A third publisher, New Hampshire Union Leader, did not execute an IO and generated less than ██████ gross revenue during the entire relevant period.  (*See, e.g.*, Alexander Dec. Ex. L).

[4]    Even this number is inflated because it presumes disgorgement of profits for all nine publishers beginning in March 2013, but most did not receive any allegedly false statements until some time after March.  Disgorgement is indisputably not available under the Lanham Act for the period before the alleged false advertising was even disseminated.  Further, the number of publishers from whom profits are potentially at issue should be even restricted to a single publisher – New Hampshire Union Leader – because, as discussed below, all of the other publishers identified by Broadspring were parties to IOs with Congoo that granted Congoo the exclusive right to require the publisher to provide Congoo with notice, typically 90 days, before removing Congoo ad units. See pp. 5-6, 12-13 below.

While not pleaded in the Second Amended Complaint, Plaintiff referenced approximately a dozen additional publishers who allegedly received the false advertising in its summary judgment papers.  (Alexander Dec., Ex. M). Even conservatively including these additional publishers – which all have Fixed Placement relationships with Congoo – the maximum recoverable gross revenues would be approximately ███████. (*See* Ex. L).  After accounting for expenses and other allowable costs and deductions, the maximum accounting that Broadspring could recover as disgorgement under the Lanham Act for the full range of publishers potentially receiving allegedly false advertising is about ██████. (*Id.*).

Even among the narrow universe of publishers alleged to have received false advertising, discovery showed that many did not rely on the statements or act to Broadspring's detriment. Indeed, many continued to work with Broadspring or terminated their relationship *with Congoo* after receiving the communications at issue:

> Reader's Digest's representative, Steven Sottile, testified that he was not dissuaded from working with Broadspring:  "[M]y mind was made up, and I didn't want to be talked out of it.  And we moved ahead with the test" of Broadspring ads.  Alexander Dec., Ex. N at 62:4-6).  Congoo gross revenues from Reader's Digest dropped by more than half the next month.  (*See* Ex. K).  By the end of 2013, Reader's Digest was no longer doing business with Congoo.  (*Id.*)

> Geology.com's representative, Hobart King, testified that he was no longer running Adblade ads and "put Taboola ads on my website, taking down Adblade."  (Alexander Dec. Ex. O at 100:20-25).  Congoo's Geology.com-related gross revenues dropped by more than half in two months.  (Ex. L).  Within four months, Geology.com no longer generated any revenue for Congoo.  *Id.*

Moreover, those publishers that remained with Congoo after receipt of the allegedly false advertising did so on account of their contractual obligations.  A majority of the nine publishers identified in the Second Amended Complaint had IOs with Congoo that included both exclusivity and termination notice provisions that obliged them to remain with Congoo, typically

for 90 days, before switching to another DMTC.[5]  Indeed, Mr. King testified that Geology.com took down Broadspring's ads after notification of a breach of an IO:  "In the telephone call that caused my initial concern, [Mr. Cosentino] said that I was out of compliance [with the IO] because I had other ads on my site."  (Ex. O at 100:12-14).[6]

Finally, Broadspring's Chief Executive Officer, Jonathan Markiles, testified that through conversations with several of these nine publishers, he was able to correct any potential damage stemming from the allegedly false advertising.  For example, in a call with a Tech Media Network representative, Mr. Markiles explained the "deceptive information that was published and the deceptive way it was published, who published it."  At the end of that conversation, the representative "thanked [Mr. Markiles] for calling him and being honest and upfront and indicated that he had wanted to maintain our relationship."  (Ex. J at 162:19-163:10).  Mr. Markiles confirmed at his Rule 30(b)(6) deposition on behalf of Broadspring that Broadspring's relationship with Tech Media continued "unabated" since it allegedly received a link to the Lens. (*Id.* at 159:19-161:17).

Similarly, in a conversation with a Reader's Digest representative, Mr. Markiles characterized the alleged false advertising as "a vicious tactic by a slimy competitor" and "based on [that] explanation," received assurances from Reader's Digest "that it shouldn't impact our business" and is not "aware" of "los[ing] any business with Reader's Digest because of the

---

[5]    Publishers alleged in the SAC that had previously executed IOs with Congoo were Geology.com, Intermarkets, Inc., the New York Daily News, Tech Media Network, Digital First, and the Journal Register Company.  (*See, e.g.,* Ex. E).

[6]    Similarly, Greg Dolan of KSL/Deseret testified that while he "sympathize[d] with Broadspring because I though Congoo's tactics … came off a little bit desperate … [and] it made me want to work with Broadspring and get rid of Adblade" (Alexander Dec., Ex. P at 38:19 – 39:5), KSL/Desert ultimately stayed with Adblade for several reasons including "they offered the increased rev[enue] share" and "things Rafael mentioned kind of spooked me … he was alleging that we had breached, and so we wanted to please him."  (*Id.*, at 79:7-22).

[L]ens." (*Id.* at 159:19-161:17).  Indeed, Brett Houck, the Broadspring Business Development

Manager responsible for the Tech Media and Reader's Digest relationships, expressly testified

that the information Mr. Cosentino allegedly circulated about Broadspring did not injure

Broadspring's relationships with these publishers.  (Ex. C at 97:3 – 16).

<u>ARGUMENT</u>

**I.    THE COURT SHOULD EXCLUDE EVIDENCE OF CONGOO'S
      GROSS REVENUES AND PROFITS FROM PUBLISHERS WHO
      <u>DID NOT RECEIVE THE ALLEGEDLY FALSE ADVERTISING</u>**

Plaintiff's disgorgement theory of recovery is governed by the Lanham Act, 15 U.S.C.

§ 1117(a), which provides, "In assessing profits the plaintiff shall be required to prove

defendant's sales only; defendant must prove all elements of cost or deduction claimed."

Plaintiff seeks to present the jury with figures of over ████████ in gross revenues and over ██

████ in gross profits based on its misunderstanding that "it is the Plaintiff's burden to identify

the gross revenues *that were obtained during the period of the alleged wrongdoing*, while it is

the Defendants' burden to identify any appropriate deductions and/or apportionment of profits to

factors other than the alleged false advertising."  (Ex. G at 9-10) (emphasis added).  This

misapprehension of Broadspring's burden runs afoul of the well established principle that a

"plaintiff who establishes false advertising under the Lanham Act is only entitled to damages

*caused by the violation*."  *Playtex Prods., Inc. v. Procter & Gamble Co.*, No. 02 Civ. 8046 WHP,

2004 WL 1658377, *6 (S.D.N.Y. July 26, 2004) (emphasis added).

As set forth below, Plaintiff's actual burden is to identify gross revenues *attributable to

the false advertising*.  By instead admittedly seeking to offer evidence of total gross revenues

"obtained during the [purported] period of the alleged wrongdoing,"[7] Broadspring presents

---

[7]    While purporting to present evidence of Congoo's gross revenues "obtained during the period of
    alleged wrongdoing," the revenues sought by Plaintiff are based on all of Congoo's alleged profits

inflated revenue and gross profits figures based on the many hundreds of publishers with whom Congoo has Fixed Placement and Media Buy arrangements, but which are not even alleged to have been exposed to any false advertising.  The resulting exorbitantly high numbers – exponentially more than Congoo's revenues and gross profits based on the narrow universe of publishers alleged to have reviewed false advertising – is unsupported by the Lanham Act.  Broadspring should be restricted to presenting evidence of Congoo's gross revenues and profits attributable to the false advertising – at minimum, to the narrow universe of publishers alleged to have received it.[8]

### A.    Plaintiff Bears the Burden of Proving Defendant's Sales Attributable to the False Advertising

In *Burndy Corp. v. Teledyne Indus., Inc.*, the Second Circuit Court of Appeals held that: (i) "a plaintiff who establishes false advertising in violation of § 43(a) of the Lanham Act will be entitled *only to such damages as were caused by the violation*" and "causation must first be established" by the plaintiff; (ii) that an accounting is warranted *when the "defendant's sales were attributable to its infringing use*"; and (iii) "the *burden of proving this connection is on the plaintiff*." 748 F.2d 767, 771-72 (2d Cir. 1984). In essence, *Burndy* clarifies the ambiguous phrase "defendant's sales" in 15 U.S.C. § 1117(a) in the only manner that makes sense in the statutory context.  The Lanham Act allows for recovery of profits *only if* one of its various specified "*violation*[s] . . . shall have been established." 15 U.S.C. § 1117(a) (emphasis added).

---

from March 2013 through August 2013, rather than being limited to being a portion of the profits earned for periods between March 2013, when the Lens was first posted, and May 10, 2013 when the last e-mail at issue was sent to one of the publishers referenced in the Second Amended Complaint.

[8]    Once Broadspring satisfies its burden to show sales relating to publishers who received the allegedly false advertising, the burden shifts to Congoo to show that the false advertising "had no relationship to [the] earnings," *George Basch Co., Inc. v Blue Coral, Inc.*,968 F.3d 1532, 1539 (2d Cir. 1992) (quotation marks omitted), and to prove allowable deductions, such as overhead and operating expenses.  *See also W.E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 665 (2d Cir. 1970).

By requiring a predicate "violation," the statute implicitly restricts recovery of a defendant's profits to that violation, and thus puts a burden on the plaintiff to "prove defendant's sales" *attributable to that violation.*

This logic was confirmed by the Second Circuit in the analogous context of copyright infringement in *On Davis v. Gap, Inc.*, 246 F.3d 152 (2d Cir. 2001).  Similar to the Lanham Act, the Copyright Act places a lesser burden on a plaintiff pursuing a disgorgement theory for infringement of its copyright:  "the copyright owner is required to present proof *only of the infringer's gross revenue*, and the infringer is required to prove his or her deductible expenses and the elements of profit attributable to factors other than the copyrighted work."  17 U.S.C. § 504(b).  Acknowledging that a "highly literal interpretation" of the statute required only proof of the infringer's gross revenues, the Second Circuit nevertheless held that the term "gross revenue" means "gross revenue *reasonably related to the infringement*, not unrelated revenues." *On Davis*, 246 F.3d at 160 (emphasis added).  The court explained its reasoning as follows:

> [I]f a publisher published an anthology of poetry which contained a poem covered by the plaintiff's copyright, we do not think the plaintiff's statutory burden would be discharged by submitting the publisher's gross revenue resulting from its publication of hundreds of titles, including trade books, textbooks, cookbooks, etc. *In our view, the owner's burden would require evidence of the revenues realized from the sale of the anthology containing the infringing poem. . . .*   The point would be clearer still if the defendant publisher were part of a conglomerate corporation that also received income from agriculture, canning, shipping, and real estate development. *While the burden-shifting statute undoubtedly intended to ease plaintiff's burden in proving the defendant's profits, we do not believe it would shift the burden so far as to permit a plaintiff in such a case to satisfy his burden by showing gross revenues from agriculture, canning, shipping and real estate where the infringement consisted of the unauthorized publication of a poem.*

*Id.* (emphasis added).

The reasoning of *On Davis* applies with equal force to the Lanham Act, and is fully consistent with the law as stated in *Burndy,* which makes clear that Broadspring bears the burden of proving Congoo sales attributable to the false advertising. *See also Lindy Pen Co., Inc. v. Bic Pen Corp.*, 982 F.2d 1400, 1408 (9th Cir. 1993) ("[A]n accounting is intended to award profits only on sales that are *attributable to the infringing conduct.* The plaintiff has only the burden of establishing the defendant's gross profits *from the infringing activity with reasonable certainty.*") (emphasis added)[9]; *Optimum Tech., Inc. v. Henkel Consumer Adhesives, Inc.*, No. 1:04-cv-1082-TW, 2006 WL 1663357, at *8 (N.D. Ga. June 14, 2006) ("An award of profits based on unjust enrichment would be appropriate if [defendant's] sales of Hold-It For Rugs were *attributable to its alleged infringing use* of the [plaintiff's] mark on the web sites. *The burden is on [plaintiff] to prove this connection. . . .*") (internal citations omitted). Only after Plaintiff meets this initial burden does it shift to Congoo to prove costs and deductions. *See Burndy*, 748 F.2d at 771.[10]

---

[9]   *Lindy Pen* is instructive.  There, much like Broadspring here, the plaintiff sought to satisfy its burden on a disgorgement of profits theory of recovery by proffering defendant's "total sales" during the infringement period.  The court held that the plaintiff had not met its burden of proof "to present competent evidence of its lost profits or [defendant's] unjust enrichment *arising from the infringement.*"  982 F.2d at 1408-09 (emphasis added).  The *Lindy Pen* Court suggested that the plaintiff would have satisfied its burden on sales had it presented evidence of the defendant's sales of the specific infringing product in the specific infringing market, and flatly rejected the plaintiff's argument that defendant bore the burden to apportion sales in this manner.  *Id.* at 1408.

[10]   Two recent District Court decisions took too narrow a read of *Burndy* and failed to consider the reasoning of *On Davis. MyPlayCity v. Conduit Ltd.*, No. 10 Civ. 1615(CM), 2013 WL 4105698 (S.D.N.Y. Aug. 12, 2013), presently on appeal to the Second Circuit Court of Appeals (Docket No. 13-2012), is factually and legally inapposite.  The revenue at issue in *MyPlayCity* was for a single product.  Unlike here, where Broadspring seeks to offer as evidence *all* of Congoo's gross revenue, there is no indication that the *MyPlayCity* plaintiff introduced all of the defendants' sales.  In *Rexall Sundown, Inc. v. Perrigo Co.*, 707 F. Supp. 2d 357 (E.D.N.Y. 2010), even while finding that a plaintiff bore less of a burden than in *Burndy*, the court stressed "when a plaintiff seeks a defendant's profits in a Lanham Act false advertising case, the plaintiff must establish only the defendant's sales *of the product at issue.*"*Id.* at 359 (emphasis added).  This language appears to recognize that if a defendant sells 100 products and only 1 is the subject of alleged infringement, a plaintiff meets its burden when it proves sales of that one product.  Neither *Rexall* nor *MyPlayCity* stands for the proposition that a plaintiff may present a jury with sales for all 100 products and shift the burden to defendant to back out revenue for the 99 non-infringing products, as Plaintiff essentially seeks to do here.

Here, the allegedly false statements were made to a small number of publishers with which Congoo had "Fixed Placement" relationships. Gross revenue or profits derived from those many hundreds of other publishers (including many with "Media Buy" relationships to Congoo), to which there is no evidence that allegedly false statements were made, should not be presented to the jury. *See Burndy*, 748 F.2d at 770 (plaintiff's evidence in part deficient for failure "to segregate profits attributable to [defendant's] sales of the offending items"); *Ahava (USA), Inc. v. J.W.G., Ltd.*, 286 F. Supp. 2d 321, 324 (S.D.N.Y. 2003) (no disgorgement where plaintiff relied on worldwide monthly sales figure and failed to provide breakdown of sales to infringing American consumers versus non-infringing foreign consumers); *Nat'l Prods., Inc. v. Gamber-Johnson LLC*, 734 F. Supp. 2d 1160, 1170-71 (W.D. Wash. 2010) (rejecting plaintiff's assertion that it need only point to "pool of money" from all of defendant's sales without meeting its "burden of showing the amount of profits attributable" to infringing activity).

Further, like the ad exchange market in which Broadspring and Congoo compete, in *Burndy* the parties operated in a competitive space that included numerous other participants. 748 F.2d at 769. In a multi-competitor market, the importance of holding Plaintiff to its burden and allowing only evidence of gross revenue and profit caused by the alleged violation is particularly important. In *Burndy*, the Second Circuit affirmed the trial court's finding of "no evidence that even a reasonably identifiable percentage of defendant's allegedly ill-gotten sales would have gone to the plaintiff in view of the existence of other competitors and competing products in the market. . . ." *Id.* at 770 (internal quotation marks omitted); *see also George Basch Co.,* 968 F.3d at 1538 ("defendant becomes accountable for its profits *when plaintiff can show* that, were it not for defendant's infringement, the defendant's sales *would otherwise have gone to the plaintiff*" (emphasis added)). Broadspring cannot demonstrate, even among the very

few publishers that received the allegedly false advertising, that Congoo's profits would otherwise have gone *to Broadspring* as opposed other DMTC competitors.  Indeed, at least one publisher representative testified that he switched from Congoo *to Taboola*, another DMTC competitor, after receiving Congoo's allegedly false advertising.  (*See* Ex. O at 100:20-25).

Based on the foregoing, Broadspring bears the burden of presenting the jury with gross revenues and profits related to the alleged false advertising.  Its admitted effort to instead proffer evidence of all "gross revenues that were obtained during the period of the alleged wrongdoing" (Ex. G at 9-10) is inconsistent with the law and should be rejected.

### B.     Evidence of Gross Revenues and Profits Not Related to the Alleged False Advertising Should be Excluded

To meet its burden of presenting the jury with sales related to the alleged false advertising, at best Broadspring may present gross revenues and profits tied to publishers who actually received the allegedly false advertising.  *See Burndy*, 748 F.2d at 770; *Ahava*, 286 F. Supp. 2d at 324; *see also Simon & Schuster v. Dove Audio, Inc.*, 970 F. Supp. 279, 302 n.22 (S.D.N.Y. 1997) (plaintiffs' failure to produce "compelling evidence suggesting that Dove's infringement actually caused any sales diversion, a requirement for recovery of profits[,]" barred award of profits under disgorgement theory).  Plaintiff bases its Lanham Act claim in the Second Amended Complaint on advertising directed to nine publishers.  Plaintiff should be precluded from presenting to the jury evidence regarding revenues or profits derived from publishers other than these nine and any other publishers for which it can offer evidence of receipt of the alleged false advertising.

Further, a majority of these nine publishers had exclusivity agreements and/or termination notices in their IOs with Congoo.  (*See* Ex. E).  For example, the IOs between Congoo and numerous publishers that allegedly received false advertising from Congoo,

including Geology.com, Intermarkets, Inc., the New York Daily News, Tech Media Network, Digital First, and the Journal Register Company, included exclusivity language ("Advertiser will have the exclusive right to serve the News Bullet® ad format which is defined as an ad with a thumbnail image, title description, and call to action. . . .") and a termination policy requiring a 30-90 day notice period. (*Id.*).  Communications between "parties with an exclusive sales agreement" do not constitute commercial advertising and thus are not actionable under the Lanham Act. *See Chamilia v. Pandora Jewelry, LLC*, No. 04-CV-6017 (KMK) 2007 WL 2781246, at *9 (S.D.N.Y. Sept. 24, 2007) (defendant, alleged to have made false statements about competitor to clients with whom she had exclusive sales agreements, awarded summary judgment because such communications deemed not actionable under Lanham Act).  For this reason, communications to any publishers with whom Congoo had an IO containing an exclusivity clause cannot form the basis of a false advertising claim, and any related sales and profit information related to such publishers should not be presented to the jury.[11]

### C. Allowing Broadspring to Present the Jury with Inflated Gross Revenues and Profits Figures Bearing No Relationship to the Alleged False Advertising Would Be Highly Prejudicial to Defendants

Plaintiff intends to present the jury with a gross revenue figure of ████████ – approximately seven times more than the actual gross revenues that could potentially be related to the false advertising. (*See* discussion above at p. 3).  Broadspring also seeks to present an unsupportable gross profits number of over ████████. (*Id.*).  By including irrelevant gross revenues and profits for the hundreds of publishers not even alleged to have been sent the false

---

[11]  Even if such communications were actionable, Plaintiff will be unable to prove that it lost business from these publishers (or that Congoo profited) because of the alleged false advertising as opposed to the IO exclusivity and termination provisions, and such sales thus should be excluded from any proffered potential disgorgement figure.  *See Scranton Gillette Commc'ns, Inc. v. Dannhausen*, No. 96C8353 1999 WL 558134, at *3 (N.D. Ill. July 27, 1999) (no damages where "plaintiff offered no evidence that even one of the 700 recipients of the [false] promotional literature declined to contract with it in reliance on [the] false statements").

advertising, Broadspring has concocted artificially inflated damages numbers that are unsupportable as a matter of law, and should not be allowed to be presented to the jury.

To allow Broadspring to present these bloated figures would prejudice the jury and taint a potential award beyond remedy.  Even if relevant, evidence may be excluded where its probative value is substantially outweighed by a danger of unfair prejudice, confusing the issues, or misleading the jury.  Fed. R. Evid. 403.   One or more of these criteria are satisfied where, as here, the discrepancy between the total gross revenues and profits figures that Broadspring seeks to offer and the amount of gross revenues and profits plausibly attributable to the false advertising is so stark.  *See On Davis*, 246 F.3d at 159 (upholding lower court's exclusion of evidence relating to defendant's gross profits in copyright action where plaintiff failed to show "causal connection between the infringement and the defendant's profits"); *Zoll v. Ruder Finn, Inc.*, No. 02 Civ. 3652 (CSH), 01 Civ. 1339 (CSH), 2004 WL 527056, at *5 (S.D.N.Y. Mar. 16, 2004) (Haight, J), (excluding evidence regarding defendants' wealth and gross profits because, among other things, it would be "highly and unfairly prejudicial" and invite improper jury award based on "the depth of [defendants'] pockets"); *see also George Basch Co., Inc.*,968 F.3d at 1540 (cautioning that improper "accounting may overcompensate for a plaintiff's actual injury and create a windfall judgment at the defendant's expense").[12]  Plaintiff should not be allowed to present distorted and prejudicial damages numbers, which bear no causal relationship to the alleged false advertising.[13]

---

[12]   An award of damages based on profits not at all related to the alleged false advertising undoubtedly would constitute a "penalty," which is impermissible under the Lanham Act.  In *Lurzer GMBH*, a trademark dispute in which the plaintiff presented the jury with "nearly all sales," the court reduced a disgorgement of profits award as "unwarranted" given the Lanham Act's "direction that any sum awarded 'constitute compensation and not a penalty." 75 F. Supp. 2d at 104-05 (citing 15 U.S.C. § 1117).

[13]   Likewise, Plaintiff should be restricted to presenting the same limited range of Congoo's revenues and profits to the jury in support of its request for damages on the defamation claim.  Moreover, any

## II.   PLAINTIFF IS NOT ENTITLED TO FUTURE CORRECTIVE ADVERTISING

In addition to other relief sought under its Lanham Act claim, Plaintiff impermissibly seeks prospective corrective advertising of approximately $1.55 million based on "evidence" of an estimate supposedly received from a strategic communications firm.  (*See* Ex. G at 4).

Prospective corrective advertising is only awarded in narrow and limited circumstances, none of which are present here.  *See Gillette Co. v. Wilkinson Sword, Inc.*, No. 89 CV 3586 (KMW), 1992 WL 30938, at *11 (S.D.N.Y. Feb. 3, 1992)("Courts have not granted such an award casually.").  It is well established that *prospective* corrective advertising is "an extraordinary remedy reserved for cases in which a plaintiff *lacks the financial ability to pay for reparative ads*." *Lurzer GMBH v. Am. Showcase, Inc.*, 75 F. Supp. 2d 98, 101 (S.D.N.Y 1998) (emphasis added); *see also Playtex Prods., Inc. v. Procter & Gamble Co.*, No. 02 Civ. 8096 (WHP) 2003 WL 21242769 (S.D.N.Y. May 28, 2003), *aff'd*, 126 F. App'x 32 (2d Cir. 2005) (prevailing party "must show that it was financially incapable of undertaking effective concurrent corrective advertising measures to counteract the false ads").  Plaintiff has not alleged nor adduced any evidence that it lacks the financial ability to pay for corrective advertising.

The $1.55 million Broadspring seeks to recover for corrective advertising is not only unwarranted as a matter of law, but also unnecessary based on the record adduced in discovery. The evidence has shown that Plaintiff took successful and cost-free corrective advertising measures.  Mr. Markiles simply picked up the phone and spoke with publishers to explain

---

award of punitive damages for that claim must be equally limited.  Under California law, where Plaintiff has suffered no or modest damages, any punitive award must be correspondingly modest. *See Provident Life & Accident Inc. Co. v. O'Connor*, 32 F. App'x. 821, 826 (9th Cir. 2002) ("California law requires that punitive damages 'bear a reasonable relationship to compensatory damages awarded.'") (quoting *Bouman v. Block*, 940 F.2d 1211, 1234 (9th Cir. 1991); *Dawe v. Corr. USA*, 506 F. App'x 657, 660 (9th Cir. 2013) ("As a general rule, 'few awards exceeding a single-digit ratio between punitive and compensatory damages, to a significant degree, will satisfy due process.'") (quoting *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)).

Broadspring's perspective, persuading several to maintain their business relationship with Broadspring. *See* Ex. J at 161:20-163:15. For this additional reason, Plaintiff is not entitled to any award for prospective corrective advertising, much less in such a high amount. *See Juicy Couture, Inc. v. L'Oreal USA, Inc.*, No. 04 Civ. 7203 (DLC) 2006 WL 1359955 at *3 (S.D.N.Y. May 18, 2006) (Cote, J.) (denying plaintiff prospective corrective advertising; "an award in these circumstances would be nothing more than a windfall"). Broadspring should further be barred from presenting any "evidence" of supposed future corrective advertising costs to the jury.

## CONCLUSION

Broadspring's actual damage for the alleged false advertising at issue is nominal. Likely for this reason, it seeks to present the jury with inflated Congoo gross revenues (over ███) and profits (over ███) figures in the hope of a bigger payday. On top of that, Broadspring seeks yet more money (another $1.55 million) under the guise of "corrective advertising." Neither the law nor the facts support evidence of these supposed "damages," which, if awarded, would amount to an impermissible windfall to Plaintiff at Defendants' expense.

Congoo respectfully submits that this Court should issue a ruling that:

(1)     Broadspring, if seeking disgorgement of Congoo's profits under an accounting theory, is precluded from presenting any evidence at trial regarding:

    (a)     Congoo's sales, revenues, or profits from or relating to publishers that Broadspring does not prove received or viewed, and acted adversely to Broadspring as a direct result of, the allegedly false statements; and

    (b)     Congoo's sales, revenues, or profits from publishers with which Congoo had an IO.

(2)     Broadspring is precluded from introducing at trial any evidence relating to the total amount of Congoo's sales, revenues, or profits; and

(3)     Broadspring is precluded from seeking costs for prospective corrective advertising and from presenting the jury with any evidence regarding the estimated cost thereof.

Dated:     New York, New York
        October 10, 2014

                    MOSES & SINGER LLP
                    *Attorneys for Defendants*

                    ___/s/ Shari Alexander_____
                    Philippe Zimmerman, Esq.
                    Shari Alexander, Esq.
                    405 Lexington Avenue
                    New York, NY 10174
                    Telephone:  (212) 554-7800
                    Facsimile:  (212) 554-7700
                    pzimmerman@mosessinger.com
                    salexander@mosessinger.com